## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

PHOENIX BEVERAGES, INC., RODB LLC,
WINDMILL DISTRIBUTING COMPANY, L.P.,
UP FROM THE ASHES, INC., and other affiliated
companies of PHOENIX BEVERAGES, INC.,

Plaintiffs,

vs.

EXXON MOBIL CORPORTATION,
EXXONMOBIL RESEARCH AND
ENGINEERING COMPANY and QUANTA
RESOURCES CORPORATION,

Defendants.

CV 12 - 3771

NO. *

COMPLAINT

(Jury Trial Demand) SUMMONS ISSUED

ROSS, J.

J. ORENSTEIN, M.J.

Plaintiffs, Phoenix Beverages, Inc., RODB LLC, Windmill Distributing Company, L.P.,

Up from the Ashes, Inc., and other affiliated companies of Phoenix Beverages, Inc. (collectively,

"Plaintiffs"), by and through undersigned counsel, for their cause of action against the

Defendants, Exxon Mobil Corporation, ExxonMobil Research and Engineering Company, and

Quanta Resources Corporation, state and allege as follows:

### NATURE OF THE ACTION

1.       This is a civil action brought by Plaintiffs pursuant to the Comprehensive

Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et

seq., Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 et seq., New York

Navigation Law, N.Y. Nav. Law § 181(5), and state law regarding private nuisance, trespass,

negligence, and strict liability seeking declaratory relief, cost recovery on a joint and several

basis, injunctive relief, damages, and attorneys' fees and costs for Defendants' contamination of

real property located at 37-88 Review Avenue, Long Island City, New York (the "Phoenix

Property").

## JURISDICTION, VENUE AND NOTICE

2.       This Court has jurisdiction over the subject matter of the First and Second Claims for Relief pursuant to § 113(b) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9613(b); § 7002(a) of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a); the Declaratory Judgment Act, 28 U.S.C. § 2201; and 28 U.S.C. § 1331.

3.       This Court has supplemental jurisdiction over the Third, Fourth, Fifth, Sixth and Seventh Claims for Relief under 28 U.S.C. § 1367 because the state law private nuisance, trespass, negligence, strict liability and State Navigation Law claims are so related to the federal claims in this action that they form the same case and controversy under Article III of the United States Constitution.

4.       Venue is proper in this Court pursuant to 42 U.S.C. § 9613(b); 42 U.S.C. § 6972(a); and 28 U.S.C. § 1391(b) because the actual and threatened endangerments, releases, injuries, and damage at issue are taking place and have taken place in this district.

5.       On or about February 7, 2012, Plaintiffs, in a Notice of Endangerment, provided notice of the endangerments and actual and threatened injuries and damages alleged herein to: (1) the Administrator of the Environmental Protection Agency ("EPA"); (2) the State of New York; and (3) each of the Defendants.  The Plaintiffs' Notices of Endangerment comply fully with RCRA, § 7002(b)(2)(A), 42 U.S.C. § 6972(b)(2)(A), and 40 C.F.R. part 254.

6.       The Plaintiffs waited at least ninety (90) days after receipt of the Plaintiffs' Notice of Endangerment by EPA, the State of New York and Defendants who were sent a notice before filing this action.

- 2 -

**THE PARTIES**

7.     Plaintiff Phoenix Beverages, Inc. is a corporation organized and existing under the laws of the State of New York, which conducted business at the Phoenix Property.

8.     Phoenix Beverages, Inc. is a "person" as that term is defined in 42 U.S.C. § 9601(21).

9.     Phoenix Beverages, Inc. is a limited partner in Windmill Distributing Company L.P., along with general partner RODB LLC and several other entities.

10.    Plaintiff RODB LLC is a limited liability corporation organized and existing under the laws of the State of New York, which conducted business at the Phoenix Property.

11.    RODB LLC is a "person" as that term is defined in 42 U.S.C. § 9601(21).

12.    Plaintiff Windmill Distributing Company, L.P. is a New York limited partnership organized and existing under the laws of the State of New York, which conducted business at the Phoenix Property.

13.    Windmill Distributing Company, L.P. is a "person" as that term is defined in 42 U.S.C. § 9601(21).

14.    Plaintiff Up From the Ashes, Inc. is a corporation organized and existing under the laws of the State of New York, which conducted business at the Phoenix Property.

15.    Up From the Ashes, Inc. has owned the Phoenix Property since 1984. Prior to October 1, 1999, Up From the Ashes, Inc. leased the Phoenix Property to Phoenix Beverages, Inc. From 1999 to 2011, Up From the Ashes, Inc. leased the Phoenix Property to Windmill Distributing Company, L.P., as the successor-in-interest to Phoenix Beverages Inc.

16.    Up From the Ashes, Inc. is a "person" as that term is defined in 42 U.S.C. § 9601(21).

17.    Up From the Ashes, Inc., RODB LLC and Windmill Distributing Company, L.P.

are affiliates of Phoenix Beverages Inc. under New York law because they are related entities that are controlled, managed, directed and operated by the same shareholders and individuals. This action is brought on behalf of these entities, in addition to Phoenix Beverages, Inc. and its other affiliated companies.

18.     Defendant Quanta Resources Corporation ("Quanta") is a Delaware Corporation doing business in the State of New York and is a "person" as that term is defined in 42 U.S.C. § 9601(21).

19.     Quanta owned and operated property located at 37-80 Review Avenue, Long Island City, New York (the "Quanta Site"), which is adjacent to the Phoenix Property.

20.     Quanta was an owner and operator of the Quanta Site from 1980 until 2005 during which period hazardous waste, solid wastes and hazardous substances were disposed of at the Quanta Site and released into the environment.

21.     Exxon Mobil Corporation is a corporation organized and existing under the laws of the State of New Jersey and is doing business across the United States, including in the State of New York.

22.     Exxon Mobil Corporation is a "person" as that term is defined in 42 U.S.C. § 9601(21).

23.     Exxon Mobil Corporation is the successor in interest to Exxon Corporation.

24.     On information and belief, Defendant Exxon Mobil Corporation has succeeded to the liabilities of one or more companies that arranged for disposal of hazardous wastes, solid wastes and hazardous substances at the Quanta Site, including the liabilities of Exxon Corporation.

25.     ExxonMobil Research and Engineering Company is organized and existing under

- 4 -

the laws of the State of Delaware and is doing business across the United States, including in the State of New York.

26.     ExxonMobil Research and Engineering Company is a wholly owned subsidiary of Exxon Mobil Corporation.

27.     ExxonMobil Research and Engineering Company is the research and engineering arm of Exxon Mobil Corporation.

28.     ExxonMobil Research and Engineering Company is the successor in interest to Exxon Research and Engineering Company.

29.     ExxonMobil Research and Engineering Company is a "person" as that term is defined by 42 U.S.C. § 9601(21)..

30.     ExxonMobil Research and Engineering Company and Exxon Mobil Corporation are affiliates under New York law.

31.     On information and belief, Defendant ExxonMobil Research and Engineering Company has succeeded to the liabilities of Exxon Research & Engineering Co., Inc.

32.     The companies that Defendant Exxon Mobil Corporation and Defendant ExxonMobil Research and Engineering Company succeeded to the liabilities of are collectively referred to as "Exxon" for the purposes of this Complaint.

## FACTS

### Disposal of Exxon's Hazardous Wastes at the Quanta Site

33.     From in or about 1970 until in or about 1981, the Quanta Site was an active disposal site and transfer facility for substances generated primarily or exclusively off-site.

34.     From in or about 1970 until in or around 1981, the Quanta Site was also a waste oil storage facility.

35.     Exxon sent hazardous wastes, solid wastes and hazardous substances for storage, transport and disposal to the Quanta Site.

36.     Exxon handled, generated and arranged for the transport and treatment or disposal of hazardous substances, which were transported to the Quanta Site between at least 1975 and 1980.

37.     The hazardous wastes, solid wastes and hazardous substances sent by Exxon to the Quanta Site included, but were not limited to, oil slop, mixed solvents, heptanes, hexane, toluene, xylene, ethylbenzene, and 1,1,1 trichloroethane.

38.     In an earlier case concerning contamination of New York City's landfills, Exxon stated that it could not be responsible for contamination at New York City's landfills, because its wastes were "always" delivered to the re-refinery located at 37-80 Review Avenue, Long Island City, New York (the Quanta Site).

39.     Exxon had many reasonable options available to it for the treatment, storage, and disposal of the wastes generated at Exxon's facilities other than disposal at the Quanta Site.

40.     At the Quanta Site, hazardous wastes, solid wastes and hazardous substances that Exxon arranged for the disposal of were mixed with hazardous wastes, solid wastes and hazardous substances from other sources, and have caused a commingled and indivisible harm.

41.     Hazardous wastes, solid wastes and hazardous substances from Exxon were disposed of, released from, and came to be located in the soil and groundwater at the Quanta Site, and have caused and contributed to releases and threatened releases to the soils and groundwater at the Phoenix Property.

42.     Disposal, storage, transportation and treatment of hazardous substances, of the type that came to be located at the Quanta Site, was and is inherently dangerous work. Exxon

- 6 -

failed to take proper precautions in selecting competent parties to do this work and failed to ensure that the work was done in a safe and reasonable manner and at an appropriate location.

## Contamination of the Phoenix Property From the Quanta Site

43.     Exxon and Quanta, in operating their businesses, used and handled hazardous wastes, solid wastes and hazardous substances, which were released and disposed of at the Quanta Site and have migrated onto the Phoenix Property.

44.     The substances disposed of, spilled and released at the Quanta Site and migrated onto the Phoenix Property include, among other things, total petroleum hydrocarbons (TPH), gasoline range organics (GRO), diesel range organics (DRO), mineral-oil range organics (MRO), benzo(a)anthracene, benzo(a)pyrene, benzo(b)fluoranthene, chrysene, phenanthrene, and other compounds.

45.     Benzo(a)anthracene, benzo(a)pyrene, benzo(b)fluoranthene, chrysene, and other substances disposed of, spilled and released at the Quanta Site and migrated on the Phoenix Property are listed at 40 C.F.R. § 302.4, and are hazardous substances as defined by CERCLA.

46.     These substances disposed of, spilled and released at the Quanta Site and migrated on the Phoenix Property are dangerous to human health and the environment and the Defendants were so aware.

47.     The methods employed to store and treat the hazardous wastes, solid wastes and hazardous substances at the Quanta Site, including the use of leaking tanks without any containment system in place and the mixing of hazardous wastes, solid wastes and hazardous substances under intense heat ranging from 200 – 220 degrees Fahrenheit, without employing any safety or leak prevention measures created a high degree of risk of some harm.

48.     Because the activities at the Quanta Site involved toxic and hazardous substances,

there was a high likelihood that any resulting harm could be great and could pose a great danger to human health and the environment.

49.     While few safety measures were actually taken at the Quanta Site, it is unlikely, even if there had been safety and leak detection measures in place, the risk could be eliminated.

50.     The Quanta Site and Phoenix Property are located less than 3 miles from Manhattan, New York and while within an industrial corridor, property values are at a premium and heavily populated areas are in close proximity.

51.     The Phoenix Property is adjacent to the Quanta Site.

52.     Substances disposed of, spilled and released at the Quanta Site migrated through the environment (including without limitation the soil and groundwater) and have come to be located at the Phoenix Property.

53.     Environmental investigations have detected that a significant plume of light non-aqueous phase liquids ("LNAPL") has migrated from the Quanta Site onto the Phoenix Property.

54.     Environmental investigations have detected that hazardous wastes, solid wastes and hazardous substances have migrated from the Quanta Site to the Phoenix Property, including, without limitation, total petroleum hydrocarbons (TPH), gasoline range organics (GRO), diesel range organics (DRO), mineral-oil range organics (MRO), benzo(a)anthracene, benzo(a)pyrene, benzo(b)fluoranthene, chrysene, phenanthrene, and other compounds.

55.     Substances disposed of, spilled and released at the Quanta Site continue to migrate through the environment and continue to enter and contaminate the Phoenix Property.

56.     The Phoenix Property, including without limitation the groundwater and soil, has suffered and continues to suffer environmental contamination caused by dangerous substances that have been discarded, released and abandoned.

57.     The hazardous wastes, solid wastes and hazardous substances in, at, around and in the vicinity of the Phoenix Property that have migrated, and continue to migrate, from the Quanta Site, have commingled to create a single and indivisible harm to the Phoenix Property.

58.     Effective October 29, 2010, EPA listed the Newtown Creek on the General Superfund Section of the National Priorities List ("NPL"). In the Hazard Ranking System ("HRS") Documentation Record compiled for purposes of listing the Newtown Creek on the NPL, EPA includes the Quanta Site as a source of contamination to the Newtown Creek.

59.     The presence of uncontrolled hazardous wastes, solid wastes and hazardous substances at and near the Quanta Site and migrating onto the Phoenix Property from the Quanta Site may present an imminent and substantial endangerment to health or the environment and will continue to present an imminent and substantial endangerment until the contamination is abated.

### Defendants' Investigation of Contamination from the Quanta Site

60.     Defendant Exxon Mobil Corporation, Defendant Quanta Resources Corporation and other parties (collectively the "Quanta Site Administrative Group") were required by the New York Department of Environmental Conservation ("NYDEC") to undertake an investigation to determine the nature and extent of subsurface contamination caused by operations at the Quanta Site.

61.     Defendants were aware that significant contamination was likely present as a result of the prior operations at the Quanta Site.

62.     At all times relevant to this complaint, Defendants were aware that Plaintiffs occupied and conducted business operations at the Phoenix Property and Defendants were aware of the close proximity between the tank sump on the Quanta Site and the property border with

- 9 -

the Phoenix Property.

63.    On June 26, 2004 and June 27, 2004, the Quanta Site Administrative Group's environmental consultant, Golder Associates ("Golder"), installed three LNAPL monitoring wells on the Phoenix Property to determine whether the plume emanating from the Quanta Site had migrated to the Phoenix Property. On July 24, 2004, Golder tested these LNAPL monitoring wells and detected more than 5.5 feet, more than 5 feet, and more than 8 feet of LNAPL in three of the LNAPL monitoring wells located on the Phoenix Property.

64.    In June 2005, Golder provided a Remedial Investigation Report ("RI Report") for the Quanta Resources Site to the NYDEC on behalf of the Quanta Site Administrative Group.

65.    The RI Report was the first comprehensive report conducted for the Quanta Site and the surrounding area that analyzed the subsurface contamination.

66.    This RI Report demonstrated that contamination from the Quanta Site had migrated onto the Phoenix Property.

67.    In May 2002, the New York State Department of Environmental Conservation ("NYSDEC") and the Quanta Site Administrative Group (of which Defendants belong) entered into a Consent Order which ordered the Quanta Site Administrative Group to conduct a Remedial Investigation and Feasibility Study for the Quanta Site.

68.    On July 8, 2005, the parties entered into a tolling agreement that has been in effect since then except for the period between April 7, 2010 and May 12, 2010 in order to maintain the status quo with respect to any potential claims while attempting to resolve the matter without resort to litigation.

69.    In February 2007, the NYSDEC issued a Record of Decision for the Quanta Resources Site. The Record of Decision required the Quanta Site Administrative Group to

- 10 -

perform certain remediation measures for the protection of human health and the environment.

70.     The NYSDEC Record of Decision concentrates the remedial actions on the Quanta Site and acknowledges the migration of contamination onto the Phoenix Property.

71.     The NYSDEC Record of Decision also requires the implementation of some remedial measure at the Quanta Site that will take an uncertain amount of time to complete.

72.     The Quanta Property has now been entered into the New York State Brownfield Cleanup Program.

73.     Phoenix has not agreed to any contamination remaining on its property.

74.     Furthermore, to date, Defendants have failed to conduct any remediation of the significant amount of LNAPL and other contamination that is migrating onto the Phoenix Property and creating an imminent and substantial endangerment to health or the environment.

**Costs Incurred by Plaintiffs to Address Contamination of the Phoenix Property**

75.     Plaintiffs have incurred costs in responding to the contamination and potential risk from the contamination migrating from the Quanta Site.

76.     Plaintiffs' costs have included, among other things, costs associated with environmental consulting services to represent Plaintiffs' interests with respect to the investigation of the Quanta Site that was required by the NYDEC to determine the nature and extent of subsurface contamination including, but not limited to, the review and analysis of scopes of works, schedules, and remedial designs; independent data analysis and interpretation and risk assessment with respect to contamination migrating onto the Phoenix Property; oversight of work activities on the Phoenix Property to ensure adequate investigation and consideration of site specific factors; and review and comment on draft reports to ensure proper consideration of Plaintiffs' interests.

- 11 -

77. Plaintiffs' costs have also included, among other things, Plaintiffs' attorneys' costs necessary to adequately identify the potentially responsible parties for purposes of negotiations and this complaint, which pursuant to *Key Tronic Corporation v. United States*, 511 U.S. 809, 820 (1994), constitute CERCLA response costs.

78. Plaintiffs' costs for responding to the contamination migrating from the Quanta Site have been incurred in compliance with the National Contingency Plan ("NCP"), 40 C.F.R. part 300, which provides "methods for evaluating ... and remedying any releases or threats of release [of hazardous substances] ...which pose substantial danger to the public health or the environment." 42 U.S.C. § 9605(a). Subpart H of the NCP provides the requirements for private party cleanups. 40 C.F.R. § 300.700.

### Contamination from the Quanta Site has Damaged Plaintiffs

79. The environmental contamination in, at, around, and in the vicinity of the Phoenix Property has caused damage to Plaintiffs and will continue to damage Plaintiffs until the contamination is fully remediated and the Phoenix Property is fully restored.

80. Actual and threatened contamination of the Phoenix Property and the continued source of contamination from the Quanta Site have sharply reduced the value of the Phoenix Property, obstructed its further development, rendered it futile as collateral or otherwise as a business asset and interfered with the Plaintiffs' highest and best use of the Property.

81. As one example, on June 24, 2009, Rod Brayman, Manager of Windmill Distributing LP, received a letter from JP Morgan Chase Bank, NA, stating that the bank could not accept the Phoenix Property as collateral for purposes of financing due to "significant environmental issues with high risk or potential liability. This risk is due to the known soil and groundwater contamination and the free product Light Non-Aqueous Phase Liquids identified in

- 12 -

on[-]site wells as a result of the northwest adjacent property (Quanta Resources)."

82.     Because of the environmental conditions on the Phoenix Property, Plaintiffs cannot effectively realize the highest and best use of their investment into the property. Plaintiffs cannot develop the property in its current condition or use it as a business asset to achieve their corporate objectives.     The Quanta Site has severely impacted the property value by the contamination complained of herein.

83.     Plaintiffs did not cause or contribute to the contamination that has harmed the value of the Phoenix Property.

84.     Plaintiffs seek immediate abatement of the contamination in, at, around and in the vicinity of the Phoenix Property in order to abate threats to human health and the environment, restore the property value, and restore the beneficial use of the Phoenix Property to the Plaintiffs.

85.     Plaintiffs seek damages for the costs that Plaintiffs have incurred responding to the contamination migrating from the Quanta Site, restoration costs to restore the Phoenix Property to the condition it was in prior to the contamination migrating from the Quanta Site, lost opportunity costs and other related business expenses caused by the contamination migrating from the Quanta Site.

86.     Defendants' commercial activities over many years involved the use of hazardous wastes, solid wastes and hazardous substances that, when released, are harmful to public health, the environment, real property value, and business operations. Under applicable federal and state law, such entities are strictly liable and are responsible for all costs related to the damage and harm caused by Defendants' releases of hazardous wastes, solid wastes, and hazardous substances and for the abatement of the risks and damages associated with their activities.

87.     By their continuing failure to act to address this situation properly and promptly

- 13 -

and in a reasonable manner, Defendants have allowed wastes to migrate from the Quanta Site onto the Phoenix Property, which has caused damage, and continues to cause damage to the Phoenix Property and to the Plaintiffs.

### FIRST CLAIM FOR RELIEF
### (CERCLA -- 42 U.S.C. § 107(a))

88.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 87.

89.     CERCLA § 107(a)(1)-(4)(B) creates a private right of action for "any ... person" to recover "necessary costs of response" incurred "consistent with the national contingency plan," plus interest. 42 U.S.C. § 9607(a)(1)-(4)(B).

90.     Subject only to narrow defenses and limitations of liability set forth in CERCLA, these costs may be recovered from any entity that falls within the four categories of parties deemed liable by Congress when (1) a release or threatened release, (2) from a facility, (3) of a hazardous substance, (4) causes the incurrence of response costs. 42 U.S.C. § 9607(a)(1)-(4)(B).

91.     The four categories of parties that Congress deemed liable for cleanup costs under CERCLA include: (1) owners and operators of facilities from which there was a release; (2) persons who owned or operated such facilities at the time hazardous substances were disposed of; (3) persons "who by contract, agreement, or otherwise arranged" for disposal, treatment or transport of hazardous substances; and (4) transporters who selected disposal or treatment sites. CERCLA § 107(a)(1)-(4), 42 U.S.C. § 9607(a)(1)-(4).

92.     CERCLA § 101(22) defines the term "release" as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substances . . . ) . . . ." 42 U.S.C. § 9601(22).

93.     The hazardous substances disposed of at the Quanta Site, which have migrated

- 14 -

onto the Phoenix Property, have been "released" within the meaning of CERCLA § 101(22), 42 U.S.C. § 9601(22).

94.     The Quanta Site is a "facility" within the meaning of CERCLA § 101(9) because it is a site "where a hazardous substance has ... come to be located." 42 U.S.C. § 9601(9).

95.     The substances disposed of, spilled and released at the Quanta Site that have migrated onto the Phoenix Property are "hazardous substances" within the meaning of CERCLA § 101(14) because they are listed at 40 C.F.R. § 302.4 as hazardous substances, or are mixtures of materials that contain hazardous substances that are listed at 40 C.F.R. § 302.4.  42 U.S.C. § 9601(14).

96.     Releases and threatened releases of hazardous substances at and from the Quanta Site have caused, and will continue to cause, the Plaintiffs to incur necessary costs of response that are consistent with the NCP.

97.     Defendant Quanta Resources Corporation is liable under CERCLA as a person who owned or operated the Quanta Site at the time of disposal of hazardous substances at that property.

98.     Defendant Exxon Mobil Corporation is liable under CERCLA as the successor to the liabilities of one or more companies that by contract, agreement or otherwise arranged for disposal or treatment of hazardous substances at the Quanta Site and arranged for transport of hazardous substances to the Quanta Site.

99.     Defendant ExxonMobil Research and Engineering Company is liable under CERCLA as the successor to the liabilities of one or more companies that by contract, agreement or otherwise arranged for disposal or treatment of hazardous substances at the Quanta Site and arranged for transport of hazardous substances to the Quanta Site.

- 15 -

100.    Defendants are jointly and severally liable for the costs incurred by Plaintiffs consistent with the NCP as a result of the hazardous substances that have been released from the Quanta Site and have migrated onto the Phoenix Property.

101.    Plaintiffs are entitled to an award of their response costs, plus interest, pursuant to CERCLA § 107(a)(1)-(4)(B), 42 U.S.C. § 9607(a)(1)-(4)(B).

102.    Plaintiffs are entitled to a declaratory judgment that the Defendants shall be jointly and severally liable for necessary future costs of investigation and cleanup consistent with the NCP in subsequent actions for further response costs, pursuant to CERCLA § 113(g)(2), 42 U.S.C. § 9613(g)(2).

**SECOND CLAIM FOR RELIEF**
**(RCRA -- 42 U.S.C. § 6972)**

103.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 102.

104.    RCRA § 6972(a)(1)(B), under which the Plaintiffs bring this claim in this action, authorizes "any person" to bring a lawsuit when: (1) "solid or hazardous waste" (2) "may present an imminent and substantial endangerment to health or the environment" and (3) the defendant falls within one of the categories of entities that Congress deemed liable for taking abatement action.

105.    The persons declared liable by Congress for potential endangerments under RCRA § 6972(a)(1)(B) are entities that contributed to "past or present handling, storage, treatment, transportation, or disposal" of the solid or hazardous waste at issue. These entities specifically include "any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility." 42 U.S.C. § 6972(a)(1)(B).

106.    Under RCRA § 6903(27), subject to limited exceptions not applicable to this case, "solid waste" is "any garbage, refuse, sludge from a waste treatment plant, water supply

- 16 -

treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial mining, and agricultural operations, and from community activities." 42 U.S.C. § 6903(27).

107.    Under RCRA § 6903(5), "hazardous waste" is: "a solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may – (A) cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or (B) pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported or disposed of, or otherwise managed." 42 U.S.C. § 6903(5).

108.    The administrative regulations promulgated under RCRA contain additional definitions of hazardous and solid waste. 40 C.F.R. Part 261. However, for purposes of RCRA § 6972(a)(1)(B) citizen suits, substances qualify as solid or hazardous waste when the statutory definitions (i.e., those set forth in RCRA §§ 6903(5) and (27)) apply. 40 C.F.R. § 261.1(b)(2); *Connecticut Coastal Fisherman's Ass'n v. Remington Arms Co.*, 989 F.2d 1305, 1315 (2d Cir. 1993).

109.    The substances disposed of, spilled and released at the Quanta Site that have migrated onto the Phoenix Property meet the definition of "hazardous waste."

110.    Each Defendant is a person or the successor to a person who has contributed to the handling, storage, treatment, transportation or disposal of hazardous or solid waste that may present an imminent and substantial endangerment to health or the environment within the meaning of section 7002(a)(1)(B) of RCRA, 42 U.S.C. § 6972(a)(1)(B).

111.    The Defendants have not stopped or prevented the potential endangerments and actual and threatened injuries and damage at issue are continuing and progressive and will persist

- 17 -

until enjoined by this Court.

112.    The Defendants' liability under RCRA § 7002(a), 42 U.S.C. § 6972(a)(1)(B), is strict, joint and several and retroactive.

113.    Unless abated by order of this Court, the potential endangerment complained of will cause irreparable injury to the Plaintiffs.

114.    Unless abated by order of this Court, the potential endangerment complained of will cause irreparable injury to human health and the environment, in, at, around and in the vicinity of the Phoenix Property.

115.    Neither EPA nor the State of New York has commenced or is prosecuting diligently an action under RCRA § 7003, 42 U.S.C. § 6973; RCRA § 7002(a)(1)(B), *id.* § 6972(a)(1)(B); or CERCLA § 106, *id.* § 9606, to abate the endangerments at issue.

116.    Neither EPA nor the State of New York is actually engaged in a removal action under the authority of CERCLA § 104, 42 U.S.C. § 9604, to abate the endangerments at issue.

117.    Neither EPA nor the State of New York has incurred costs to initiate a remedial investigation and feasibility study under CERCLA § 104, 42 U.S.C. § 9604, and is diligently proceeding with a remedial action under CERCLA to abate the endangerments at issue.

118.    No responsible party is diligently conducting a removal action, remedial investigation and feasibility study or proceeding with a remedial action pursuant to a judicial or administrative order obtained by EPA under CERCLA § 106, 42 U.S.C. § 9606, or RCRA § 7003, *id.* § 6973, to abate the endangerments at issue.

119.    The Plaintiffs shall serve a copy of this Complaint on the Attorney General of the United States and on EPA.

120.    The Plaintiffs are entitled to relief under RCRA § 7002(a), 42 U.S.C. § 6972(a),

restraining the Defendants and requiring each of them, jointly and severally, to take such action as may be necessary to abate the potential endangerments at issue.

121.     The Plaintiffs are also entitled to an order requiring the Defendants to pay the Plaintiffs' costs of litigation, including reasonable attorney and expert witness fees, pursuant to RCRA § 7002(e), 42 U.S.C. § 6972(e).

### THIRD CLAIM FOR RELIEF
### (Private Nuisance)

122.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 121.

123.     New York's common law of private nuisance addresses "interference with the use and enjoyment of land" where the interference affects "one person or a relatively few." *Copart Industries, Inc. v. Consolidated Edison Co. of New York, Inc.*, 41 N.Y.2d 564, 568 (1977).

124.     Private nuisance is "actionable by the individual person or persons whose rights have been disturbed." *Id.* at 568.

125.     A defendant is liable "for a private nuisance if his conduct is a legal cause of the invasion of the interest in the private use and enjoyment of land and such invasion is (1) intentional and unreasonable, (2) negligent or reckless, or (3) actionable under the rules governing liability for abnormally dangerous conditions or activities." *Id.* at 569.

126.     A condition that is unlawful even if created with the utmost care is a nuisance per se. *McFarlane v. City of Niagara Falls*, 160 N.E. 391, 391-92 (N.Y. 1928) (one "is not to [create a nuisance per se] at all, whether he is negligent or careful").

127.     One who creates a nuisance through an inherently dangerous activity or use of an unreasonably dangerous product is absolutely liable for resulting damages, regardless of fault, and despite adhering to the highest standard of care. *State v. Schenectady Chemicals, Ind.*, 459 N.Y.S.2d 971, 976 (N.Y. Sup. Ct. 1983), *aff'd in pertinent part*, 479 N.Y.S.2d 1010 (N.Y. App.

Div. 1984).

128.    Under New York law, "[e]veryone who creates a nuisance or participates in the creation or maintenance of a nuisance are liable jointly and severally for the wrong and injury done thereby." *Schenectady Chemicals,* 459 N.Y.S.2d at 977.

129.    New York law recognizes that "[e]ven a non-landowner can be liable for taking part in the creation of a nuisance upon the property of another." *Schenectady Chemicals,* 459 N.Y.S.2d at 977.

130.    Each of the Plaintiffs had a possessory interest in the Phoenix Property, where Plaintiffs operated their businesses.

131.    Defendants' acts and omissions have interfered with Plaintiffs' use and enjoyment of the Phoenix Property.

132.    Defendants have acted intentionally and unreasonably and/or negligently and recklessly in failing to abate the contamination of the Phoenix Property, contain the source of the contamination of the Phoenix Property, and prevent additional waste material from migrating onto the Phoenix Property from the Quanta Site.

133.    The disposal, storage, transportation and treatment of hazardous wastes, solid wastes and hazardous substances in the manner conducted by the Defendants at the Quanta Site constitute abnormally dangerous conditions.

134.    By their continuing failure to act for more than thirty years, the Defendants have allowed wastes to continue to migrate through the Quanta Site to the Phoenix Property. The continued and uncontrolled migration of such waste through the environment is a condition that is unlawful, regardless of circumstances.

135.    Plaintiffs have suffered, and continue to suffer, damages from the nuisance

complained of because the contamination has impaired Plaintiffs' ability to make the highest and best use of the Phoenix Property and has damaged and continues to damage the value of the Phoenix Property.

136.    Unless abated by order of this Court, the private nuisance complained of will continue to cause Plaintiffs irreparable injury.

137.    Unless abated by order of this Court, the private nuisance complained of will cause irreparable injury to human health and the environment in, at, around and in the vicinity of the Phoenix Property.

138.    Defendants' liability to abate the nuisance is strict, joint and several.

## FOURTH CLAIM FOR RELIEF
### (Trespass)

139.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 138.

140.    Under New York law, trespass is the intentional invasion of another's property. *Scribner v. Summers*, 84 F.3d 554, 557 (2d Cir. 1996). "To be liable, the trespasser 'need not intend or expect the damaging consequence of his intrusion[;]' rather, he need only 'intend the act which amounts to or produces the unlawful invasion.'" *Id.* (quoting *Phillips v. Sun Oil Co.*, 307 N.Y. 328, 331 (1954)).

141.    In New York, when "polluting material has been deliberately put onto, or into, defendant's land" the defendant is liable for damage to his neighbor's land if the defendant "had good reason to know or expect that subterranean and other conditions were such that there would be passage from defendant's to plaintiff's land." *Phillips*, 307 N.Y. at 330; *Scribner*, 84 F.3d at 558.

142.    There exists a cause of action for trespass whenever an allegedly harmful or toxic substance is disposed of onto the property of another. *Scribner*, 84 F.3d at 557.

- 21 -

143. Defendants' acts and omissions have caused the invasion of hazardous wastes, solid wastes and hazardous substances onto the Phoenix Property.

144. Defendants had good reason to know that by disposing the hazardous wastes, solid wastes and hazardous substances underground with such willful disregard for the consequences and without taking any reasonable and proper precautions, the hazardous wastes, solid wastes and hazardous substances would migrate through the environment, including the soil and groundwater, and enter the adjoining Phoenix Property.

145. The invasion of the Defendants' hazardous wastes, solid wastes and hazardous substances has reduced the value of the Phoenix Property, forced Plaintiffs to incur costs responding to the contamination and potential risk, and interfered with Plaintiffs' highest and best use of their investment in the Phoenix Property.

146. The Defendants have continued to allow the invasion of hazardous wastes, solid wastes and hazardous substances for more than thirty years without implementing any remedial actions to prevent the further migration of such contamination.

147. Unless abated by order of this Court, the trespass complained of will continue to cause Plaintiffs irreparable injury.

148. Unless abated by order of this Court, the trespass complained of will cause irreparable injury to human health and the environment in, at, around and in the vicinity of the Phoenix Property.

## FIFTH CLAIM FOR RELIEF
### (Negligence)

149. Plaintiffs reallege and incorporate by reference paragraphs 1 through 148.

150. Negligence is conduct which falls below the standard established by law for the protection of others against unreasonable risk. *Morris v. Troy Savings Bank*, 302 N.Y.S.2d 51,

51 (N.Y. App. Div. 1969), aff'd 268 N.E.2d 805 (N.Y. 1971); *McLean v. Triboro Coach Corp.*, 96 N.E.2d 83, 83 (N.Y. 1950).

151.    The elements to establish negligence are (1) a duty of care owed to the Plaintiffs, (2) negligent conduct or breach of the duty of care of a reasonably prudent person, (3) which causes, (4) Plaintiff's injury or damages. *Akins v. Glens Falls City School District*, 424 N.E.2d 531, 535 (N.Y. 1981).

152.    A landowner who engages in activities that may cause injury to persons on adjoining premises owes those persons a duty to take reasonable precautions to avoid injuring them. *Weitzman v. A.L. Barber Asphalt Co.*, 83 N.E. 477, 479 (N.Y. 1908); *532 Madison Avenue Gourmet Foods v. Finlandia Center, Inc.*, 750 N.E.2d 1097, 1102 (N.Y. 2001).

153.    Defendants knew, or should have known, the dangerous, hazardous, and toxic nature of the chemicals released from the Quanta Site and allowed to migrate onto the Phoenix Property.

154.    Defendants knew, or should have known, the dangerous, hazardous, and toxic nature of the chemicals was capable of causing serious property damage if released and allowed to migrate.

155.    Defendants owed a duty to Plaintiffs, as the adjoining property owner and occupants, with regard to Defendants' use, ownership and operation of the Quanta Site, including a duty to prevent the releases and a duty to take all reasonable measures necessary to protect the public, including Plaintiffs, from the hazardous substances.

156.    Defendants acted negligently in causing the releases and the contamination by failing to take reasonable measures and precautions necessary to avoid and/or respond to the releases and the contamination.

- 23 -

157.    Defendants' acts and omissions were the direct and proximate cause of the damages and injuries to Plaintiffs.

158.    Defendants have continued to allow the invasion of hazardous wastes, solid wastes and hazardous substances for more than thirty years without implementing any remedial actions to prevent the further migration of such contamination.

159.    By reason of their negligence, Defendants are liable for all of the damages and injuries to Plaintiffs proximately caused by the releases and the contamination and to remediate the contamination.

### SIXTH CLAIM FOR RELIEF
### (Strict Liability)

160.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 159.

161.    "Those who engage in activity of sufficiently high risk of harm to others, especially where there are reasonable even if more costly alternatives, should bear the cost of harm caused the innocent." *Doundoulakis v. Hempstead*, 368 N.E.2d 24, 27 (N.Y. 1977)

162.    An activity is abnormally dangerous based on the weighing of factors including, but not limited to, the existence of a high degree of risk of some harm, likelihood that the resulting harm will be great, an inability to eliminate the risk by the exercise of reasonable care, and the extent to which the activity's value to the community is outweighed by its dangerous attributes. *Doundoulakis*, 368 N.E.2d at 27; Restatement of Torts Second § 520.

163.    "From review of the authorities there emerges a dominant theme, viz., that strict liability will be imposed upon those who engage in an activity which poses a great danger of invasion of the land of others." *Doundoulakis*, 368 N.E.2d at 27-28.

164.    Defendants, in conducting their businesses with respect to the disposal, storage and treatment of hazardous substances at the Quanta Site, engaged in an ultra-hazardous activity.

- 24 -

165.   The hazardous substances disposed of, stored, and treated at the Quanta Site, which migrated onto the Phoenix Property, are or were of a toxic and hazardous nature capable of causing severe personal injuries to those coming in contact with the hazardous substances, and therefore are or were ultra-hazardous or abnormally hazardous materials.

166.   The disposal, storage and treatment in such a manner to allow the discharge, leakage and release of hazardous wastes, solid wastes and hazardous substances into the environment is not a matter of common usage and is inappropriate where the Quanta Site is located.

167.   The danger of Defendants' activities outweighs their value to the community.

168.   The disposal, storage, and treatment of the hazardous wastes, solid wastes and hazardous substances at the Quanta Site in close proximity to the Phoenix Property was and continues to be an abnormally dangerous and ultra-hazardous activity, creating a risk to the environment regardless of the degree of caution one might have exercised, and warranting imposition of strict liability.

169.   Defendants' activities presented, and continue to present, a high degree of risk of harm to the Phoenix Property and such harm has caused significant injuries to Plaintiffs.

170.   As a proximate result of Defendants' engaging in such ultra-hazardous or abnormally dangerous activities, Plaintiffs have sustained injury and suffered losses.

171.   By engaging in ultra-hazardous or abnormally hazardous activities, Defendants' are strictly liable without regard to fault for all of the damages and injuries to Plaintiffs proximately caused by the releases and the contamination and to remediate the contamination.

## SEVENTH CLAIM FOR RELIEF
### (New York State Navigation Law -- § 181)

172.   Plaintiffs reallege and incorporate by reference paragraphs 1 through 171.

- 25 -

173.    Under New York Law, an injured party may bring a strict liability claim directly against any party responsible for the discharge of petroleum contamination to recover cleanup and removal costs as well as direct and indirect damages. N.Y. Nav. Law § 181(5).

174.    The purpose of the New York Navigation Law is to require prompt cleanup and removal of oil and fuel discharge, to minimize damage to the environment, to restore the environment to its "pre-spill condition," and to compensate those damaged by such discharge. *AMCO Intl. v. Long Is. R.R. Co.,* 754 N.Y.S.2d 655 (N.Y. App. Div. 2003).

175.    In determining whether a diminution in the value of the premises has occurred in an environmental contamination case, the court may consider evidence as to whether the stigma caused by the oil spill has had any impact on the value of the subject property. *Turnbull v. MTA New York City Transit*, 814 N.Y.S.2d 191 (N.Y. App. Div. 2006).

176.    The New York State Navigation Law defines "petroleum" to include "oil or petroleum of any kind and in any form including, but not limited to, oil, petroleum, fuel oil, oil sludge, oil refuse, oil mixed with other wastes and crude oils, gasoline and kerosene." New York Nav. Law § 172(15).

177.    The waste oil Defendants disposed of at the Quanta Site, which migrated onto the Phoenix Property, is within the definition of petroleum provided by New York Nav. Law § 172(15).

178.    The waste oil Defendants disposed of at the Quanta Site migrated onto the Phoenix Property, causing damage to Plaintiffs and the Phoenix Property.

179.    Defendants' discharges of petroleum, which have migrated onto the Phoenix Property, have reduced the property value, forced Plaintiffs to incur costs responding to the contamination and potential risk, and have cost Plaintiffs other indirect costs.

180. Defendants are strictly liable under the Navigation Law as persons who discharged petroleum at and from the Quanta Site causing direct and indirect damages to Plaintiffs.

181. Pursuant to the Navigation Law § 181(5), Plaintiffs are entitled to an award of cleanup and removal costs and direct and indirect damages, including attorneys' fees that were incurred by Plaintiffs as a result of the discharge, plus interest, based on the strict liability imposed by the Navigation Law.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for judgment as follows:

### First Claim for Relief

On the first claim for relief, with respect to all Defendants, Plaintiffs ask this Court to:

A. Declare, pursuant to CERCLA § 113(g)(2), 42 U.S.C. § 9613(g)(2), that Defendants are jointly and severally liable for any necessary costs of response, removal or remedial action incurred in connection with the contamination or threatened contamination from the Quanta Site in a manner consistent with the NCP; and

B. Declare, pursuant to CERCLA § 113(g)(2), 42 U.S.C. § 9613(g)(2), which abatement plan for actual and threatened releases at or from the Quanta Site and migrating onto the Phoenix Property is cost-effective, appropriate, necessary and consistent with the NCP and, thus, which abatement plan should be implemented; and

C. Order Defendants, jointly and severally, to pay Plaintiffs an amount to be determined at trial to reimburse Plaintiffs for necessary costs of response incurred consistent with the NCP and pay the Plaintiffs pre-judgment interest at the rate mandated by Congress.

### Second Claim for Relief

- 27 -

On the second claim for relief, with respect to all Defendants, Plaintiffs ask this Court to:

D.      Declare, pursuant to 28 U.S.C. § 2201, that the Defendants are jointly and severally liable for taking all necessary action to investigate, abate and otherwise respond to potential endangerments associated with solid or hazardous wastes that are located at, may have passed through, or threaten to become located at to or pass through, the Phoenix Property; and

E.      Enter a mandatory injunction ordering the Defendants, jointly and severally, to pay to Plaintiffs an amount of money determined at trial to be sufficient to fund the Plaintiffs' development and implementation of a cost-effective plan, consistent with the NCP and such orders as may be entered by this Court, to (1) eliminate all unacceptable risks to the public and environment from the potential endangerment at or affecting the Phoenix Property, and (2) restore the Phoenix Property, as expeditiously as practicable, to a condition consistent with the widest range of beneficial and unrestricted use of that property and surrounding area; and

F.      Order Defendants, jointly and severally, to pay Plaintiffs their costs of litigation, including but not limited to reasonable attorneys' and expert witness fees, as authorized by 42 U.S.C. § 6972(e).

## Third Claim for Relief

On the third claim for relief, with respect to all Defendants, Plaintiffs ask this Court to:

G.      Declare, pursuant to 28 U.S.C. § 2201, that Defendants are jointly and severally liable for taking all necessary action to investigate, abate and otherwise respond to the private nuisance arising from the Quanta Site and harming the Phoenix Property; and

H.      Award Plaintiffs damages or restitution as appropriate for Defendants' failure to take all necessary actions to prevent, investigate, abate and otherwise respond to the private nuisance from the Quanta Site and affecting the Phoenix Property; and

- 28 -

I.      Award Plaintiffs punitive damages for the egregious interference to and damage to the Phoenix Property caused by Defendants' wanton and willful or reckless disregard for Plaintiffs' rights as the adjoining property owner.

J.      Require Defendants to implement an appropriate abatement plan for actual and threatened releases at or from the Quanta Site and migrating onto the Phoenix Property, and to compensate Plaintiffs for abatement measures required on the Phoenix Property.

**Fourth Claim for Relief**

On the fourth claim for relief, with respect to all Defendants, Plaintiffs ask this Court to:

K.      Award Plaintiffs damages or restitution as appropriate for the interference to and damage to the Phoenix Property caused by Defendants' failure to take all necessary actions to prevent, investigate, abate and otherwise respond to the trespass from the Quanta Site and affecting the Phoenix Property; and

L.      Award Plaintiffs punitive damages for the egregious interference to and damage to the Phoenix Property caused by Defendants' wanton and willful or reckless disregard for Plaintiffs' rights as the adjoining property owner.

M.      Require Defendants to implement an appropriate abatement plan for actual and threatened releases at or from the Quanta Site and migrating onto the Phoenix Property, and to compensate Plaintiffs for abatement measures required on the Phoenix Property.

**Fifth Claim for Relief**

On the fifth claim for relief, with respect to all Defendants, Plaintiffs ask this Court to:

N.      Award Plaintiffs damages as appropriate for the harm to and damage to the Phoenix Property caused by Defendants' breach of its duty to take reasonable actions to prevent, investigate, abate and otherwise respond to the contamination from the Quanta Site and affecting

the Phoenix Property; and

O.     Award Plaintiffs punitive damages for the egregious interference to and damage to the Phoenix Property caused by Defendants' wanton and willful or reckless disregard for Plaintiffs' rights as the adjoining property owner.

P.     Require Defendants to implement an appropriate abatement plan for actual and threatened releases at or from the Quanta Site and migrating onto the Phoenix Property, and to compensate Plaintiffs for abatement measures required on the Phoenix Property.

### Sixth Claim for Relief

On the sixth claim for relief, with respect to all Defendants, Plaintiffs ask this Court to:

Q.     Award Plaintiffs damages or restitution as appropriate for the damage to the Phoenix Property caused by Defendants' storage, treatment and disposal of hazardous wastes, solid wastes and hazardous substances that resulted in the migration of contamination from the Quanta Site to the Phoenix Property; and

R.     Award Plaintiffs punitive damages for the egregious interference to and damage to the Phoenix Property caused by Defendants' wanton and willful or reckless disregard for Plaintiffs' rights as the adjoining property owner.

S.     Require Defendants to implement an appropriate abatement plan for actual and threatened releases at or from the Quanta Site and migrating onto the Phoenix Property, and to compensate Plaintiffs for abatement measures required on the Phoenix Property.

### Seventh Claim for Relief

On the seventh claim for relief, with respect to all Defendants, Plaintiffs ask this Court to:

T.     Declare, pursuant to Navigation Law § 181(5), that Defendants are strictly liable for all costs of cleanup and removal and direct and indirect damages, including attorneys' fees

that were incurred by Plaintiffs as a result of the discharge, incurred in connection with the contamination migrating from the Quanta Site; and

    U.    Order Defendants to pay Plaintiffs an amount to be determined at trial to reimburse Plaintiffs for cleanup and removal costs, all costs associated with any direct and indirect damages, including attorneys' fees that were incurred by Plaintiffs as a result of the discharge, and pay Plaintiffs pre-judgment interest at the rate mandated by Congress; and

    V.    Require Defendants to implement an appropriate abatement plan for actual and threatened releases at or from the Quanta Site and migrating onto the Phoenix Property, and to compensate Plaintiffs for abatement measures required on the Phoenix Property.

### All Causes of Action

On all of the claims for relief, Plaintiffs ask this Court to:

    W.    Retain continuing jurisdiction of this action to the extent necessary and for as long as necessary to enforce and interpret, and to review Defendants' compliance with, this Court's orders;

    X.    Award Plaintiffs attorneys' fees and costs consistent with applicable law; and

    Y.    Grant it such other and further relief as the Court deems just and appropriate.

### DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury of any and all issues so triable.

DATED this 30th day of July, 2012.

                           **HUNSUCKER GOODSTEIN & NELSON, P.C.**

                By:                                    
                         Michael D. Goodstein
                         Eastern District New York Bar No. MG9891
                         Stacey H. Myers

*(Pro Hac Vice Forthcoming)*
Kathleen J. Trinward
*(Pro Hac Vice Forthcoming)*
5335 Wisconsin Avenue, NW Suite 360
Washington, DC  20015
(202) 895-5380
mgoodstein@hgnlaw.com

Attorneys for Plaintiffs