ARENT FOX LLP
Allen G. Reiter
Donald B. Mitchell, Jr.
Jennifer L. Bougher
Adrienne M. Hollander
1675 Broadway
New York, New York 10019
Phone:  212-484-3900
*Attorneys for Defendant Quanta Resources Corporation*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| PHOENIX BEVERAGES, INC., RODB LLC, WINDMILL DISTRIBUTING COMPANY, L.P., UP FROM THE ASHES, INC., and other affiliated companies of PHOENIX BEVERAGES, INC., <br><br> Plaintiffs, <br><br> vs. <br><br> EXXON MOBIL CORPORATION, EXXONMOBIL RESEARCH AND ENGINEERING COMPANY and QUANTA RESOURCES CORPORATION, <br><br> Defendants. | Case No. 1:12-CV-03771(PKC) (JO) |
| EXXON MOBIL CORPORATION and QUANTA RESOURCES CORPORATION, <br><br> Third-Party Plaintiffs, <br><br> vs. <br><br> ACE WASTE OIL, INC., et al., <br><br> Third-Party Defendants. | |

**MEMORANDUM OF LAW OF
DEFENDANT QUANTA RESOURCES CORPORATION
IN OPPOSITION TO PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION**

## <u>TABLE OF CONTENTS</u>

Page

PRELIMINARY STATEMENT ..........................................................................................1

THE FACTS ......................................................................................................................2

    A.    Phoenix is Not Facing Irreparable Harm or Imminent Danger ................. 2

    B.    The Phoenix Site Was the Heart of the Former Pratt Oil Works Refinery and has been Completely Contaminated Since the Late 1800's ....................................................................................................... 5

    C.    Phoenix Bears Responsibility for  Some of the Contamination at the Phoenix Site .................................................................................... 9

    D.    The History of the Phoenix Site and Quanta Site  Bars Phoenix from Showing a Likelihood of Success on the Merits ........................... 10

    E.    Phoenix's Delays and Other Conduct Belies its Claim of Imminent Danger and Irreparable Harm ................................................. 12

    F.    Phoenix has a Complete Remedy at Law ............................................. 16

    G.    The NYSDEC is Investigating the Phoenix Site .................................... 17

    H.    Neither the NYSDEC nor the NYSDOH Have Ever Required Emergency Measures at the Phoenix Site .............................................. 18

    I.    Phoenix is Seeking Relief that it Would Achieve if it Won this Case on the Merits ................................................................................ 18

ARGUMENT ................................................................................................................. 19

  I.  Phoenix Has Not Made A "Clear Showing" That It Can Succeed On The Merits ........ 23

    A.    There Is No "Imminent Danger" ........................................................... 24

        1.    Quanta Has Been Investigating And the Environmental Experts Confirm That There Is No Imminent Danger ................. 25

        2.    Soil Vapor Issues Are Being Addressed Via the NYSDEC Process; This Court Should Not Substitute Its Judgment for the NYSDEC Which Has Elected Not To Require the Measures Phoenix Now Advocates ............................................ 27

        3.    Purely Speculative "Danger" Does Not Satisfy RCRA or the Rigorous Mandatory Preliminary Injunction Requirements ..................................................................... 29

    B.    Phoenix Has Not Proven That Defendants Are Responsible For The Purported Danger; Serious Causation Problems Plague Phoenix's Case ................................................................................... 31

  II.  Phoenix Has Not Shown Any Threat of "Irreparable Harm" ........................................ 36

i

III.  The Balancing Of The Hardships Weighs Heavily In Defendants' Favor ................... 39

CONCLUSION ......................................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*87th St. Owners Corp. v. Carnegie Hill-87th St. Corp.*,
  251 F. Supp. 2d 1215 (S.D.N.Y. 2002).................................................................28

*ABB Indus. Sys., Inc. v. Prime Tech., Inc.*,
  120 F.3d 351 (2d Cir. 1997)......................................................................32, 33

*Almontaser v. N.Y.C. Dep't of Educ.*,
  519 F.3d 505 (2d Cir. 2008).........................................................................19

*Asdourian v. Konstantin*,
  50 F. Supp. 2d 152 (E.D.N.Y. 1999) ...............................................................38

*Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
  459 U.S. 519 (1983)..................................................................................34

*Bank of New York Mellon Trust Co., N.A. v. Morgan Stanley Mortg. Capital Inc.*,
  No. 11 Civ. 0505, 2013 WL 3146824 (S.D.N.Y. Jun. 19, 2013)...........................27

*Buchholz v. Dayton Int'l Airport*,
  No. C-3-94-435, 1995 WL 811897 (S.D. Ohio Oct. 30, 1995) ...........................22

*Cacchillo v. Insmed, Inc.*,
  638 F.3d 401 (2d Cir. 2011)....................................................................20, 25

*Cerruti, Inc. v. McCrory Corp.*,
  438 F.2d 281 (2d Cir. 1971).........................................................................35

*Christie-Spencer Corp. v. Hausman Realty Co.*,
  118 F. Supp. 2d 408 (S.D.N.Y. 2000)......................................................... passim

*City of Newburgh v. Sarna*,
  690 F. Supp. 2d 136, 145 (S.D.N.Y. 2010), *aff'd in part, app. dismissed in part*, 406
  F. App'x 557 (2d Cir. 2011) ...............................................................20, 21, 38

*Columbia Gas Transmission Corp. v. Tarbuck*,
  845 F. Supp. 303 (W.D. Pa. 1994)................................................................27

*Columbia Gas Transmission, LLC v. Robert Borror Logging, LLC*,
  No. 2:12-CV-39, 2012 WL 2294870 (N.D. W.Va. Jun. 15, 2012)........................27

*Davis v. Cuomo*,
  No. 1:10-CV-0220, 2010 WL 2925710 (N.D.N.Y. Jul. 20, 2010) ........................34

*Delaney v. Town of Carmel*,
    55 F. Supp. 2d 237 (S.D.N.Y. 1999)..................................................................32

*Dora Homes, Inc. v. Epperson*,
    344 F. Supp. 2d 875 (E.D.N.Y. 2004) ................................................................4

*Eastin-Phelan Corp. v. Hal Roach Studios, Inc.*,
    350 F. Supp. 1328 (S.D.N.Y. 1972).................................................................35

*Francisco Sanchez v. Esso Standard Oil Co.*,
    572 F.3d 1 (1st Cir. 2009).................................................................21, 22, 23, 36

*Gen. Motors LLC v. Lewis Bros.*,
    No. 10-CV-725S, 2012 WL 3839320 (W.D.N.Y. Sept. 4, 2012)......................36

*Grace Christian Fellowship v. KJG Invs. Inc.*,
    No. 07-C-0348, 2009 WL 2460990 (E.D. Wisc. Aug. 7, 2009)....................21, 36

*Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*,
    263 F. Supp. 2d 796 (D.N.J. 2003), *aff'd*, 399 F.3d 248 (3d Cir. 2005)................23

*Kamerling v. Massanari*,
    295 F.3d 206 (2d Cir. 2002).............................................................................36

*Kara Holding Corp. v. Getty Petroleum Mktg., Inc.*,
    No. 99 Civ. 0275, 2004 WL 1811427 (S.D.N.Y. Aug. 12, 2004) ....................28

*Key Tronic Corp. v. U.S.*,
    511 U.S. 809 (1994)........................................................................................37

*Majorica, S.A. v. R.H. Macy & Co.*,
    762 F.2d 7 (2d Cir. 1985).................................................................................38

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997)........................................................................................19

*Mullis v. Arco Petroleum Corp.*,
    502 F.2d 290 (7th Cir. 1974) ...........................................................................20

*Murtaugh v. New York*,
    810 F. Supp. 2d 446 (N.D.N.Y. 2011).............................................................33

*Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*,
    596 F.3d 112 (2d Cir. 2010).............................................................................37

*People v. Deitsch*,
    97 A.D.2d 327 (2d Dep't 1983) .......................................................................15

*People v. Nelson*,
    309 N.Y. 231 (N.Y. 1955) ........................................................................15

*People v. Reyes*,
    75 N.Y.2d 590 (N.Y. 1990) ......................................................................15

*Plateau Mining Corp. v. Fed. Mine Safety & Health Comm'n*,
    519 F.3d 1176 (10th Cir. 2008) ...............................................................27

*Prisco v. A & D Carting Corp.*,
    168 F.3d 593 (2d Cir. 1999) .....................................................................31

*Rodriguez v. DeBuono*,
    175 F.3d 227 (2d Cir. 1999) .....................................................................36

*Santoro v. Donnelly*,
    340 F. Supp. 2d 464 (S.D.N.Y. 2004) .......................................................4

*Scotchtown Holdings LLC v. Town of Goshen*,
    No. 08-CV-4720, 2009 WL 27445 (S.D.N.Y. Jan. 5, 2009) .....................27

*Shatkin v. McDonnell Douglas Corp.*,
    727 F.2d 202 (2d Cir. 1984).......................................................................4

*Smith v. Potter*,
    187 F. Supp. 2d 93 (S.D.N.Y. 2001).....................................................27, 29

*T.M.T. Trailer Ferry, Inc. v. Union De Tronquistas De P.R., Local 901*,
    453 F.2d 1171 (1st Cir. 1971) ...................................................................21

*Texas E. Transmission v. Perano*,
    No. Civ.A. 04-3915, 2005 WL 289932 (E.D. Pa. Feb. 4, 2005) ..............27

*Tilot Oil, LLC v. BP Prods. N. Am., Inc.*,
    907 F. Supp. 2d 955 (E.D. Wisc. 2012).....................................................22

*Town of Riverhead v. CSC Acquisition-NY, Inc. (Cablevision)*,
    618 F. Supp. 2d 256 (E.D.N.Y. 2009) ...............................................36, 37, 38

*Tri-Realty Co. v. Ursinus Coll.*,
    Civ. No. 11-5885, 2013 WL 5298469 (E.D. Pa. Sept. 19, 2013) .............22

*Triebwasser & Katz v. AT&T Co.*,
    535 F.2d 1356 (2d Cir. 1976)...........................................................37, 39, 40

*U.S. v. Apex*,
    No. 05-CV-242, 2008 WL 2945402 (S.D. Ill. Jul. 28, 2008) ..................23

*Univ. of Tex. v. Camenisch*,
  451 U.S. 390 (1981)...................................................................................20

*W.R. Grace & Co.-Conn. v. Zotos Int'l, Inc.*,
  559 F.3d 85 (2d Cir. 2009)......................................................................37

*Wilson v. Amoco Corp.*,
  989 F. Supp. 1159 (D. Wyo. 1998)..............................................20, 25, 29

*Winter v. NRDC, Inc.*,
  555 U.S. 7 (2008)....................................................................................36

**STATUTES AND RULE**

42 U.S.C. § 6972(a)(1)(B) .............................................................................24, 32

Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§
  9601, *et seq.* ("CERCLA") ........................................................................16

FRCP 65(c) ....................................................................................................23

**OTHER AUTHORITIES**

Wright and Miller, 11A FED. PRAC. & PROC. CIV. § 2948.1 (3d ed.)...........................36

## PRELIMINARY STATEMENT

In this motion, plaintiffs ("Phoenix") claim to face irreparable harm from an alleged "imminent and substantial endangerment" from an explosion in or under its building in Long Island City (the "Building" at the "Phoenix Site") due to underground methane gas unless this Court issues an extraordinary and unprecedented mandatory preliminary injunction against defendants Quanta Resources Corp. ("Quanta") and Exxon Mobil Corp. ("Exxon").

Phoenix's motion is utterly lacking in merit for nine independent reasons:

(i)      the risk of an explosion at the Building is remote and speculative at best, and therefore Phoenix is not facing an imminent and substantial endangerment;

(ii)     the Phoenix Site was thoroughly contaminated for decades before Phoenix purchased it and there has been no change that has now created an "emergency;"

(iii)    the environmental testing results show that Phoenix's own underground storage tanks ("USTs") and truck maintenance operations have contributed to the contamination of its property;

(iv)     Phoenix can show neither a likelihood of success on the merits or even "sufficiently serious questions going to the merits to make them a fair ground for litigation" against Quanta.

(v)      Phoenix's lengthy delay in seeking injunctive relief, its failure to mitigate the alleged risk after raising purported concerns about a potential explosion as early as 2004, and its failure to inform its tenants of any life-threatening risk at the Building thoroughly refute its claims of an immediate hazard that requires this Court's emergency intervention;

(vi)     Phoenix has the financial wherewithal and environmental consultants to enable it to undertake the measures it is seeking this Court to order, and therefore has a complete remedy at law under CERCLA, barring injunctive relief;

(vii)    the Phoenix Site is being investigated under the direction of the New York State Department of Environmental Conservation (the "NYSDEC"), with a full report on its environmental conditions being submitted to the NYSDEC later this very week;

(viii)   both the NYSDEC and the New York State Department of Health (the "NYSDOH") have received the data upon which Phoenix primarily relies, and have never directed any emergency action; and

(ix)   by its motion, Phoenix seeks to obtain the relief that it would secure only after prevailing at trial, and it would be error for Phoenix to obtain it while the parties are still engaged in fact discovery, with critical fact and expert discovery yet to have been conducted.

Any one of these factors would compel the denial of Phoenix's motion. Taken together, they demonstrate its wholly frivolous and meritless nature. While Phoenix's motion papers seek to convey the image of a looming catastrophe that this Court alone can prevent and that could only have been created from property once owned by Quanta (the "Quanta Site"), the reality is far different. Subject to scrutiny, Phoenix's factual and legal arguments evaporate.

The defendants have already committed to spend (and have spent) vast sums of money addressing the conditions at the Quanta Site and any contamination that the NYSDEC believes may have emanated from it. In the next few *days* they will be submitting the results of their most recent study — an in-depth investigation of environmental conditions on the Phoenix Site itself, called a Remedial Investigation Focused Feasibility Study (the "RI/FFS") — to the NYSDEC. Once the NYSDEC, the state agency charged with protecting and enhancing the environment in New York since 1970, reviews the RI/FFS, it will direct any action it believes is required. Quanta has no intention of putting the lives of people at risk, but maintains that the NYSDEC is in the best position to assess the conditions at the site and determine the appropriate remedy.

## THE FACTS

### A.   PHOENIX IS NOT FACING IRREPARABLE HARM OR IMMINENT DANGER

None of the tests conducted at the Phoenix Site have ever disclosed explosive levels of methane gas inside its building. In contrast, those tests have revealed that methane is barely detectable. Simon Decl.[1] ¶¶10-17; S. Mitchell Decl. ¶¶ 21, 26-29; Reiter Ex. 34; Reiter Decl. ¶¶

---

[1] References in the form of "Mem. at ___" are to Plaintiffs' Memorandum of Law in Support of Motion for Preliminary Injunction; "Pl. Ex. ___" are to exhibits Plaintiffs filed with their Motion for Preliminary Injunction (the "PI Motion"); "Fort Decl. ¶ ___" are to paragraphs in the Declaration of Tomlinson Fort, dated October 27, 2014, filed as Pl. Ex. 1 in support of the PI Motion; "Fort Att. ___" are to attachments to the October 27, 2014 Fort

34-35.  These tests, first conducted in 2004, conducted again in 2009, again in Spring 2014, and again just last week at the direction of Quanta and Exxon, demonstrate that there are only minute levels of methane in the Building — the *highest* was less than 1/100[th] of the lower explosive limit ("LEL") — posing no possible danger to the tenants in the Building or the structure itself.[2]

Nor can Phoenix identify a pathway for methane that may exist under its structure that would permit methane to enter its Building.  Rather, the soundness of its 6" thick concrete floor — designed to support large trucks and thousands of cases of beer — has sealed the structure from any vapor found below it, as is conclusively proven by the near absence of any methane in the Building.  Simon Decl.¶¶ 15, 17; Simon Ex. E at 80-95; Reiter Ex. 11.  While Phoenix claims that the methane on its property might be dangerous if the property was excavated, that does not constitute an "imminent" endangerment, since Phoenix, notably, does not claim that it has any such plans.  Phoenix's "expert," Tomlinson Fort ("Fort") from Apex Companies L.L.C. ("Apex"), conjures up the possibility that methane "may" find its way into confined spaces with "ignition source[s]" (Fort Att. D at ES-2), but never actually identifies any such spaces on the Phoenix Site, let alone attempts to show that the methane in such unknown spaces might

---

declaration; Reiter Decl.  ¶ ___" are to paragraphs in the Declaration of Allen G. Reiter, dated November 10, 2014, filed in opposition to the PI Motion; "Reiter Ex. ___" are to exhibits to the November 10, 2014 Reiter declaration; "D. Mitchell Decl. ¶ ___" are to paragraphs in the Declaration of Donald B. Mitchell, Jr., dated November 10, 2014, filed in opposition to the PI Motion; "D. Mitchell Ex. ___" are to exhibits to the November 10, 2014 D. Mitchell declaration; "Simon Decl. ¶ ___" are to paragraphs in the Declaration of John A. Simon, dated November 9, 2014, filed in opposition to the PI Motion; "Simon Ex. ___" are to exhibits to the November 9, 2014 Simon declaration; "S. Mitchell Decl. ¶ ___" are to paragraphs in the Declaration of Stuart Mitchell, dated November 10, 2014, filed in opposition to the PI Motion; "S. Mitchell Ex. ___" are to exhibits to the November 10, 2014 S. Mitchell declaration; "Coslett Decl. ¶ ___" are to paragraphs in the Declaration of Craig B. Coslett, dated November 10, 2014, filed in opposition to the PI Motion; and "Coslett Ex. ___" are to exhibits to the November 10, 2014 Coslett declaration.

[2] While the LEL for methane is 50,000 parts per million ("50,000 ppm"), the tests just performed this week on the Building revealed either *zero* methane or concentrations of methane of merely one part per million (1ppm) in most parts of the Building.  The *highest* level of methane detected, in one of Phoenix's floor drains, was 370 ppm (370/1,000,000), or 1/135 of the LEL.  S. Mitchell Decl. ¶ 28.  These results are consistent with all of the previous test results in the Building.

somehow be more than 135 times higher (the concentration necessary to be explosive) than in any other location in the Building.

More importantly, Fort never cites a single instance where degraded Light Non-Aqueous Phase Liquid ("LNAPL")[3] underneath a building has ever resulted in a methane explosion, let alone one where virtually no methane arising from below-ground sources has ever been detected. In addition, as established by Quanta's expert witness John Simon ("Simon"), in his Declaration, such an event may never have ever occurred (Simon Decl. ¶ 16).  The absence of any actual explosion in the many buildings above degraded LNAPL around the United States betrays the speculative horribles that Fort conjures.

Accordingly, Phoenix's claims of imminent harm are both refuted by all of the available evidence and are based upon unsupported speculation and guesswork. There is no emergency.

Phoenix's motion is based completely on Fort's Declaration.  As demonstrated in the next sections, the Fort Declaration is, at best, the product of willful ignorance, and this Court should not rely upon any of the unsupported and speculative conclusions that Fort urges upon it.[4]

---

[3] LNAPL is a groundwater contaminant that is not soluble in water and has lower density than water.  Examples of LNAPLs include gasoline, benzene, toluene, xylene, and other hydrocarbons.  *See* http://en.wikipedia.org/wiki/Light_non-aqueous_phase_liquid (last visited November 10, 2014).

[4] New York courts have consistently excluded an expert's opinion in its entirety where it is based on insufficient or unreliable data or unsupported speculation.  *See Dora Homes, Inc. v. Epperson*, 344 F. Supp. 2d 875, 889 (E.D.N.Y. 2004) (excluding expert's opinion as to when underground tanks began leaking because the expert's conclusions "are patently devoid of reliability ... [and] rest upon nothing more than subjective belief and unsupported speculation, and are based on data and a methodology which are simply inadequate …, or contrary to the documented facts"); *Santoro v. Donnelly*, 340 F. Supp. 2d 464, 475-76 (S.D.N.Y. 2004) (concluding that expert opinion was inadmissible due to inconsistent and unreliable factual basis as well as expert's failure to conduct an independent inspection or evaluation); *Shatkin v. McDonnell Douglas Corp.*, 727 F.2d 202, 208 (2d Cir. 1984) (affirming District Court's decision to exclude testimony of plaintiff's economics expert because "a number of assumptions and assertions made by [the expert] were so unrealistic and contradictory as to suggest bad faith").

4

**B.      THE PHOENIX SITE WAS THE HEART OF THE FORMER PRATT WORKS REFINERY AND HAS BEEN COMPLETELY CONTAMINATED SINCE THE LATE 1800'S**

As shown below, and in the accompanying Declarations of Donald B. Mitchell, Jr. and John Simon — and as entirely and willfully ignored by Fort — the Phoenix Site was, for about 67 years, the heart of an enormous oil refinery, the "Pratt Works," originally controlled and operated by the Standard Oil Company and then by its successors.  Exxon does not dispute its responsibility for the Pratt Works' legacy of contamination.

Exhibiting blindness that can only be intentional, in both his company's reports and his own Declaration, Fort claims that the Quanta Site alone is the source of the extensive contamination on the Phoenix Site, *e.g.*:

> As the Quanta site is the source for the oil beneath the Phoenix property, and the oil is the cause for flammable soil vapor, the Quanta oil plume is also the cause for associated fire/explosion risk in buildings, potential excavations, and buried utilities on the Phoenix property . . . .
>
> Other than the Quanta oil plume, no plausible source for high concentrations of shallow methane has been shown to exist.

Fort Att. D at E-S1 - ES-2.   In light of  the undisputed evidence discussed below about the previous uses of the Phoenix Site, the findings by Golder that have been shared with Apex and Fort, and the *publicly available* reports filed by Exxon's consultants with the NYSDEC, Fort's blanket assertions are so totally lacking in credibility that this Court should disregard his opinions in their entirety.

The evidence that Fort has chosen to disregard overwhelmingly establishes the Pratt Works' primary responsibility for all or most of the contamination at the Phoenix Site.  The significance of the Pratt Works operations is twofold:

First, oil has been degrading beneath the Building since 1882, when the Pratt Works began operating in an era when there were no environmental concerns, regulations or regulatory agencies.  That oil was certainly there in huge quantities by 1971, when Guinness Harp

5

Corporation ("Guinness") erected the Building on a then unpaved Phoenix Site.  Reiter Ex. 10.

And it was certainly underneath the Building in 1984, when Phoenix purchased it.  Simon Decl.

¶¶ 10, 21-33.  As Simon notes:

> Therefore, petroleum contamination at the Phoenix site has been degrading for at
> least 65 years and has been under the Phoenix building for over 40 years.  The site
> conditions are such that if the risk of explosion was imminent, then a flash or
> other evidence of petroleum flammability is expected to have occurred during this
> time period, but it has not.  Furthermore, if petroleum vapors were seeping into
> the building at an appreciable concentration, then there would be a detectable
> odor; however, no petroleum odors inside the building have been reported.

Simon Decl. ¶ 10.  This evidences highlights the purely speculative nature of Phoenix's claims.

Second, while Phoenix has completely failed to demonstrate any possible threat to the

Building or its tenants, if this Court were to credit its unsubstantiated claims in this motion, there

is no basis to charge Quanta — which operated at the adjacent Quanta Site for only two years —

with responsibility for that threat.

The Pratt Works was a massive oil refinery that operated from 1882 until 1949 along

Review Avenue and Newtown Creek.  D. Mitchell Decl. ¶ 4.  Documents authored by executives

of Standard Oil and its successor companies establish the enormous scope of the operations at

the Pratt Works.  *Id*. ¶¶ 17-18, nn. 2 & 3.  The Pratt Works employed as many as 500 people and

utilized 120 storage tanks capable of storing more than *87 million gallons* of oil.  *Id*. ¶ 17.  As of

1913, the refinery handled 200,000 gallons of oil *each day*, 94% of which was processed into

fuel oil, gas oil and various lubricating oils.  *Id*. ¶ 20.  The Pratt Works received much of its oil

from the Sone & Fleming Refinery on the Brooklyn side of Newtown Creek (also owned by

Standard Oil), which partially processed the crude oil it received by pipeline before sending it to

the Pratt Works by pipelines that ran under Newtown Creek.  *Id*. ¶¶ 18-20.  And it appears that

*all of the oil processed by the Pratt Works was run through a filter press located on the Phoenix*

*Site* and then through stills, some of which were *also* located there, making the Phoenix Site the core processing area in the whole refinery. *Id.* ¶¶ 19-21.

Similarly, the property immediately east-adjacent of the Phoenix Site, now occupied by LeNoble Lumber Co., Inc. ("LeNoble"), was the central oil storage and cleaning location of the Pratt Works. *Id.* ¶ 22. As seen in the 1949 aerial photograph and the 1903 Ullitz map, from at least 1903 until 1949, that site held six huge oil tanks. D. Mitchell Exs. 15, 29. Each tank was approximately 90 feet in diameter; three of them ran immediately adjacent to the east side of the Phoenix Site. Each of these tanks had a capacity of about 47,000 gallons per foot in height. Therefore, if those tanks were 30 feet tall, each of them could store over 1.4 million gallons of liquid. Simon Decl. ¶ 28. And the Phoenix Site, in addition to the stills and the filter press house, had its own collection of storage tanks. Based on measurements from the 1949 aerial photograph, the five largest tanks on the Phoenix Site itself were approximately 40 feet in diameter and were all located on the west side of the Phoenix Site, adjacent to the Quanta Site boundary. At 40 feet in diameter, the tanks would have a storage capacity of over 9,000 gallons for every foot in height; if such a tank were 30 feet tall, it could hold at least 270,000 gallons of liquid. *Id.* ¶ 27.

While this history, standing alone, is sufficient to identify at least another "plausible source" (to use Fort's term) for the Phoenix Site contamination that has existed under the Building since Phoenix purchased it 30 years ago, there is more.

Pursuant to an Order from the NYSDEC issued in 2008, Exxon has been investigating every parcel of the Pratt Works (other than the Phoenix Site (D. Mitchell Decl. ¶ 26)) employing Kleinfelder East, Inc. ("Kleinfelder") as its consultant. Kleinfelder has reported to the NYSDEC

that something they call "broad cut distillate" — essentially mid-process refinery oil —has been found throughout the Pratt Works.  *Id*. ¶ 27.

Reports prepared by Kleinfelder and publicly filed with the NYSDEC establish the widespread contamination with "broad cut distillate" created by the Pratt Works:

> Furthermore, the general uniform classification of the petroleum products, and their distribution throughout the Inland Parcels [along Review Avenue], appears to align with the historic use of this portion of the Project Area for bulk storage of refined petroleum products.

*Id*. ¶ 27, quoting Ex. 33 at 78-79.

Nearly every parcel of land on which the Pratt Works operated is heavily contaminated and every parcel of land bordering the Phoenix Site is sitting on a boatload of oil.  *Id.*; Simon Decl. ¶ 31.  The extent of the Pratt Works contamination is so great that even though LNAPL is lighter than water and generally floats above the water table, on LeNoble and Phoenix it is *thirty feet below the water table*, an outcome that can occur only when the mass of the LNAPL is enormous.  Simon Decl. ¶¶ 31-32.  Even today, oil is seeping into Newtown Creek as a result of the operations at the Pratt Works. Reiter Decl. ¶ 5, Ex. 2.  Exxon is addressing this seepage.  *Id*. ¶ 5, Ex. 3.

Phoenix and Fort contend that the Phoenix Site was somehow the exception — that the Pratt Works polluted the entire property on which it operated except the Phoenix Site where the core operations occurred, and that "no data" supports the conclusion that there was any contamination on the Phoenix Site until after they purchased it in 1984.  Fort Decl. ¶ 28. Phoenix, whose corporate representative disingenuously refused even to acknowledge that any part of the Pratt Works operated on its property when presented with pictures (Reiter Decl. ¶ 4, Ex. 1), has no explanation for this miraculous outcome that somehow left its property

immaculate.  Its contention that all of the contamination on its site is from the Quanta Site is outrageous.

### C.   PHOENIX BEARS RESPONSIBILITY FOR SOME OF THE CONTAMINATION AT THE PHOENIX SITE

Moreover, the on-site contamination of the Phoenix Site did not end with the closing of the Pratt Works.  Although Fort and Phoenix pretend otherwise, Phoenix's activities during its 26 years of operations at the Phoenix Site both had the potential to and did contaminate it.

Phoenix operated a virtual gas station for its beverage truck fleet on its property for 26 years.  It installed two new USTs (its predecessor had also installed two USTs, which were on the Phoenix Site from 1971-1984[5]), which it filled with diesel fuel and gasoline that it used to fuel its large fleet of vehicles until it fully transferred its operations to Red Hook in 2011,  Reiter Decl. ¶¶ 10-14.  From those USTs, it admits that it pumped as much as *5,000 gallons per month* of diesel fuel into its fleet of vehicles on-site.  *Id*. ¶ 14, Exs. 15, 19.  Soil vapor tests taken in the vicinity of Phoenix's USTs reveal the presence of compounds related to gasoline and diesel, including MTBE, a gasoline additive introduced in 1979 and thus not possibly related to Exxon or Quanta's historic operations, in quantities that dwarf the presence of those compounds anywhere else on the Phoenix Site or on the adjacent properties.  Simon Decl. ¶¶ 45-48.  But that is not all.  From 1984 until 2000 Phoenix also performed routine maintenance of its delivery fleet in the Building, changing the oil in its trucks and other vehicles.  Reiter Decl. ¶¶ 19-20.  Gas stations are notorious sources of pollution.  Phoenix has not disclosed how it stored or disposed of the waste oil during the 16 years it performed maintenance on its vehicles and has ignored the

---

[5] Reiter Decl. ¶ 10.

findings of fuel-related compounds in the vicinity of its USTs.  *Id.* ¶¶ 21-23.[6]

### D. THE HISTORY OF THE PHOENIX SITE AND QUANTA SITE BARS PHOENIX FROM SHOWING A LIKELIHOOD OF SUCCESS ON THE MERITS

As shown above, from 1882 until 2010, a period of 128 years, the Phoenix Site has been a source of petroleum contamination; on an industrial scale from 1882-1949 and on the scale of a gas station from 1955-2010, with Phoenix itself responsible for those operations for 26 years.

The property to the west / northwest of the Phoenix Site along Review Avenue, the so-called "Quanta Site," has had its own lengthy history of oil operations.  From 1933 until 1970, it was owned and operated by Triplex Oil and Refining Company, which re-refined used oil. Reiter Decl. ¶ 61.  In 1970, the Quanta Site was acquired by Russell Mahler ("Mahler"), who, through various companies he owned, controlled or operated, accepted industrial waste and processed waste oil on the property until 1980.  *Id.* ¶ 62.  Thus, by 1980, the Quanta Site had been in use as a waste oil recycling facility by Triplex and Mahler for 47 years.

On July 29, 1980, Quanta purchased the Quanta Site from Mahler.  Quanta processed waste oil at the Quanta Site for less than two months, although it received small quantities of waste oil on its property until October 1981, when it sought bankruptcy protection under Chapter 11, and then, just one month later, went into liquidation under Chapter 7. Id. ¶¶ 63, 67.  In the fall of 1982, the New York City Department of Environmental Protection removed all of the waste oil from the tanks and pipes on the Quanta Site, a little more than two years after Quanta had purchased the property.  *Id.* ¶ 67.  Thus, at the worst, Quanta processed oil at its property for

---

[6] In addition, before Guinness built what is now the Phoenix building in 1971, a motor freight station operated on the Phoenix Site for 15 years, from 1955-1970, again without any environmental oversight. Reiter Decl. ¶¶ 7-10. While Quanta has so far been unable to develop detailed information about the operations of this company, it operated as a truck terminal and motor vehicle repair shop, which clearly had the potential to create its own contamination on the Phoenix Site, and would be consistent with findings of oil just below the ground surface and waste oil on the site.  The Phoenix Site was unpaved during the time that it operated.  Reiter Decl. ¶ 9; Reiter Ex. 10.

less than two months, received waste oil at the site for 15 months and stored oil for a bit more than two years.  Once any possible ongoing source of contamination was removed from the Quanta Site, any waste oil on its property would be immobile.  Att. A to Ex. 1 of Pls' Motion at 88-90, 92-97.

Those minimal operations contrast with 47 years of oil recycling before Quanta ever came on the scene.  Thus, of the oil-related operations on the Quanta Site, Quanta at worst is responsible for 4% of those operations based on its years of storing oil there and just 2% of the operations on that site.  And during the time that Quanta operated, it was under the scrutiny of the NYSDEC.  Contrary to Phoenix's innuendo, that agency never found fault with Quanta's site-related conduct and never issued a violation relating to contamination at the Quanta Site.

Phoenix faces a series of hurdles in its effort to pin liability on Quanta, none of which it even attempts to overcome in its submission.[7]  First, as is detailed in the Simon Declaration, the LNAPL on the Quanta Site contains PCBs, including in a well adjacent to the Phoenix Site.  If LNAPL attributable to disposals from Quanta's operations had migrated onto the Phoenix Site, the PCBs would have too, but there are no PCBs on the Phoenix Site.  Simon Decl. ¶ 43.  The absence of PCBs on the Phoenix Site is evidence that LNAPL from the Quanta Site did not migrate to the Phoenix Site.  Second, oil has been found on the Phoenix Site *just below the ground surface*.  It is not possible for any LNAPL which may have migrated from the Quanta Site to be found so close to the surface, because LNAPL is subject to the laws of gravity and could not flow across the property line on top of the groundwater and then *rise* on its own to just below the ground surface.  The presence of LNAPL so close to the surface conclusively proves an on-site source of contamination.  *Id*. ¶ 35.  In addition, the immobility of the LNAPL on the

---

[7] On pages 18 to 19 of Plaintiffs' Motion, they allege that Quanta is a "transporter" of hazardous waste.  *See* Pls' Motion at 18-19.  They do not make that allegation in their complaint.

Quanta Site, and the distribution pattern of the LNAPL on the Phoenix Site all disprove any role of the Quanta Site in damaging the Phoenix Site.  *Id*. ¶¶ 38-44.

As is explained below, under controlling Second Circuit law, in order for Phoenix to impose liability upon Quanta, it has the burden of proof of showing that material that *Quanta itself* — not Triplex, and not Mahler — "disposed" on the Quanta Site during the brief time it operated and stored waste oil there has migrated to the Phoenix Site.  Phoenix fails even to argue this point, let alone supply any evidentiary support for it.  Phoenix argues only that the Quanta *Site* — not Quanta itself — is the sole source of contamination of the Phoenix Site.  Even if that were true, such a conclusion would not be sufficient to impose liability on Quanta.  Accordingly, Phoenix cannot possibly show a likelihood of success on the merits against Quanta, nor even sufficiently serious questions going to the merits to make them a fair ground for litigation.

### E.   PHOENIX'S DELAYS AND OTHER CONDUCT BELIES ITS CLAIM OF IMMINENT DANGER AND IRREPARABLE HARM

As shown herein, Phoenix has known about the presence of methane in the soil at LELs since June 2004 and the subject has repeatedly been brought to its attention (and the attention of NYSDEC).  During that nearly ten-year span, virtually no new data has emerged justifying the emergency nature of this motion.  In addition, Phoenix has taken no steps to address what it now claims is a sudden existential emergency.  Reiter Decl. ¶ 56, 58, 60.  Moreover, even though it admits that it is renting the Building to companies that employ more than 100 people at the Building, it has never advised them that their lives are (allegedly) in danger.  *See* Plaintiffs' PI Motion at 6; Reiter Decl. ¶ 60.  Taken together, these factors demonstrate that there is no need for this Court to issue a mandatory injunction.

The existence of LEL detections in the soil at the Phoenix Site is not news.  Phoenix has received frequent reports about the presence of methane in the soil at the Phoenix Site for nearly

10 years.  Only now, for reasons best known to Phoenix, has it chosen to sound a false alarm, at

enormous cost to the Defendants and an enormous time commitment by the Court.

On June 29, 2004 counsel for Phoenix spoke with Golder, who advised them that

during recent sampling activities on [the Phoenix Site], the lower explosive limit ("LEL")
for vapors emanating from the boreholes was exceeded in several of the well borings
during drilling and/or in headspace readings after well development.  I further understand
that Golder Associates is taking measures to ensure that none of the vapors present a risk
of explosive hazard or vapor inhalation to workers or invitees at the properties, and that
field instrument readings indicated that at no time did concentrations in the ambient air in
the vicinity of the wells exceed concentrations that would present a risk to human health.

 Reiter Ex. 33.  On August 1, 2004, Geomatrix conducted an ambient air sampling event at the

Phoenix Site and *all LEL readings came back zero* at all six locations (five indoor and one

indoor).  Reiter Ex. 34.  Prior to the indoor sampling, the building was closed and there was no

ventilation of the lower floor for a period of ~ 36 hours."  *Id.*

On December 18, 2009, Geosyntec Consultants ("Geosyntec") reported to Phoenix and to

the NYSDEC that:

The results of the field screening of soil gas indicated elevated concentrations of
methane present in all samples collected at the Phoenix property.  The measured
concentrations exceeded the lower explosive limit in air for methane (5% by
volume) in all samples.

Fort Att. F at 13.  As a result of these findings, "a decision was made to perform a building

survey at the Phoenix property and to screen indoor air for methane"  *Id.*  On February 9, 2010,

Geosyntec issued its Phase IIA Soil Vapor Investigation Report.  Fort Decl. at Att. F.  Phoenix's

attorneys received a copy of this report the next day.  Reiter ¶ 43.  This report directly addressed

the LEL methane readings.  It found no basis for concern about any danger to the Building or its

occupants.  Fort Att. F. at 13, 15.  Specifically, it found that other than in a sump and floor

drains, which contained 1/100th of the LEL, "methane was not measured above 1 ppm

[1/1,000,000 of the LEL]."  *Id.* at 13. 15  Phoenix's attorney raised no concerns about the LEL

levels in January 2010.  Reiter Decl. ¶ 41-42.  Additional tests, conducted pursuant to the continuing NYSDEC investigation in January, April and October 2013, showed methane inside wells (so-called "well headspace") on Phoenix's property, a result that is to be expected if air is tested inside a well that contains LNAPL.  S. Mitchell Decl. ¶21; Simon Decl. ¶19.  In June 2013 — *16 months* ago — Phoenix cited the January and April results in a status conference before Magistrate Judge Orenstein, and then stated in a letter filed with this Court that "based on . . . new data, the extent of Quanta-sourced contamination on the Phoenix Property present[ed] a significant risk for tenants and visitors at the Property."  Reiter Exs. 45, 46.  But Phoenix took no action about the alleged danger.  Although there is no evidence of any change in the conditions at the Phoenix Site since then, Phoenix waited an additional 16 months before filing this motion, further evidence of the complete absence of any emergency.  Phoenix's almost *ten-year* delay — since the 2004 Golder and Geomatrix investigations — in seeking emergency relief from this Court mandates the denial of its motion.

If there were any realistic possibility that waste attributable to Quanta's operations was presently a danger to Phoenix's tenants or the Building, Quanta would take immediate steps to ensure against that possibility.  But all of the data reflects just the opposite — there is not even a remote danger of an explosion at the Phoenix Site and Quanta bears no responsibility for the mass of LNAPL on the site.

In addition, Phoenix's claim that the Building might explode at any minute is belied by its refusal to take any steps to address Phoenix's claims, by the passage of time dating back to when Phoenix first learned about methane in its soil and by Phoenix's failure to warn its tenants of any supposed danger.  Moreover, the only basis for any claim of danger is Fort's Declaration,

but his opinion is so tainted that it cannot serve as the basis for Phoenix's claims herein, which essentially seek summary judgment.

Moreover, Phoenix has not spent even a nickel to remediate the supposedly dangerous condition with which it is faced, despite having paid their consultants, as of March 19, 2014, more than $600,000.  Nowhere does it explain its failure to act.  Despite claiming that only this Court's immediate action can protect the more than 100 occupants of its Building, Phoenix has failed to take any steps to protect them or even to advise them of the "danger."  Reiter Decl. ¶ 55-60.

Having moved out of the Building to the Red Hook Terminal, Phoenix employs a property manager, Alan Dern ("Dern"), to rent it to multiple parties on its behalf.  Reiter Decl. ¶ 52.  It manages to reap nearly $1 million a year in the resulting rentals.  Reiter Decl. ¶ 53.  In the course of his deposition, Dern admitted that many of the occupants of the Building are not even aware that it is sitting on a contaminated site, that he was never told that there was any imminent danger at the Building and that he never knew (because he was not told by Phoenix) that there was methane in the soil beneath the Building.  Reiter Decl. ¶¶ 56, 58.  And a recent announcement that Phoenix directed Dern to post in the Building, which he regarded casually and doubted all of the tenants had even seen, (Reiter Ex. 48 at 276:6-278:10; 327:14-24; 176:7-177:2), was obviously prepared with this motion in mind.  *E.g.,* R. Brayman Decl., Att. B, to Phoenix motion.

If Phoenix truly believed that its tenants were in imminent danger, its conduct would be criminally reckless if one of its tenants sustained an injury as a result of a methane explosion.[8] The far more reasonable supposition, in light of its inaction prior to this motion with full

---

[8] *See People v. Reyes*, 75 N.Y.2d 590 (N.Y. 1990) (upholding indictment for*, inter alia*, manslaughter against property owner); *People v. Nelson*, 309 N.Y. 231 (N.Y. 1955) (sustaining conviction for manslaughter); and *People v. Deitsch*, 97 A.D.2d 327 (2d Dep't 1983) (reinstating manslaughter indictment).

knowledge of the conditions at the Phoenix Site, coupled with its decision to earn a seven-figure profit from the rental stream of its tenants, is that this motion is merely a litigation tactic.

### F.    PHOENIX HAS A COMPLETE REMEDY AT LAW

The Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, *et seq*. ("CERCLA"), encourages a party whose property is contaminated to remediate the property and then seek recovery of its "response costs" from the parties that are responsible for creating the contamination.  In this action, Phoenix is seeking to recover its purported response costs from the Defendants.  Reiter Ex. 63.  In its most recent Rule 26 disclosures, now more than seven months old, Phoenix claimed to have incurred CERCLA response costs of $601,541.75.  Reiter Decl. ¶ 33.  Since Phoenix has the means and the ability to eliminate the conditions it contends may destroy the Building, it could have done so at any time since 2004 and then sought to recover its outlay from the Defendants.  *See, infra,* Section E.  It could have done so before seeking relief from this Court, yet chose not to.  Its refusal to do anything belies its claims that it is facing an emergency.

And Phoenix cannot blame a lack of expertise to explain away its inaction.  As noted above, in this motion Phoenix relies wholly upon Fort's opinion.  Fort states that he is a senior project manager at Apex.  Fort Decl. ¶ 3.  Apex's web site boasts of its capabilities in remediating soil vapor and preventing dangerous vapors from entering buildings.

> Apex develops and implements vapor intrusion mitigation plans and systems that increase property value while decreasing risk.  Apex provides vapor intrusion services on a national basis to commercial retail clients, commercial property owners, management companies and REITs.

Reiter Decl. ¶ 29.  Apex has even designed a proposed remedy for the Phoenix Site.  Fort Decl.

¶¶ 31-33 and Att. H.  Another one of Phoenix's consultants, GEI Consulting, Inc.,[9] cites its

expertise in many environmental disciplines, including air monitoring.  Reiter Decl. ¶ 30.  Acting

on Phoenix's behalf, its attorneys at Kelley Drye LLP retained environmental consultants in

September 2002, more than 12 years ago. Reiter Decl. ¶ 26.

     Nor can Phoenix claim that it is prevented from taking action because it lacks the

financial wherewithal to do so.  While Phoenix portrays itself as a "family business," it employs

as many as 1,000 people and enjoys revenue from its core operations of approximately $250

million per year.  Reiter Decl. ¶ 31.  It surely has the means to eliminate the danger it claims to

have been created by Quanta and, if successful on the merits, to recover those costs from the

Defendants under CERCLA.  Yet instead of doing so — despite having already alleged that it

has incurred CERCLA response costs in excess of $600,000 — it is seeking to have this Court

direct the Defendants to perform the work.

### G.      THE NYSDEC IS INVESTIGATING THE PHOENIX SITE

     The Defendants, among others, have retained Golder to perform an RI/FFS at the

Phoenix Site under the supervision of the NYSDEC.  That report, which will be the most

extensive characterization of the Phoenix Site to date, will be submitted to the NYSDEC later

this week.  S. Mitchell Decl. ¶ 26-27.  As the New York State agency charged with remediating

contaminated sites, the NYSDEC has the expertise and the vast experience needed to evaluate

any dangers posed by contamination.  Quanta respectfully submits that the choice of any remedy

for the Phoenix Site is most appropriately left to the State agency, which has a broad mandate to

protect the environment. Reiter Decl. ¶ 37.  If this Court issues an order based on Phoenix's

---

[9] GEI Consulting, Inc. is currently employed by Phoenix through Kelly McIntosh, who previously worked at
Geomatrix.  Reiter Ex. 27 at PBQE00244093.

presentation, it may conflict with the remedy that the NYSDEC will direct, a situation that

should be avoided.

### H.   NEITHER THE NYSDEC NOR THE NYSDOH HAVE EVER REQUIRED EMERGENCY MEASURES AT THE PHOENIX SITE

The NYSDEC and the NYSDOH have been informed about the methane in the soil at the

Phoenix Site for years.  As established by the Stuart Mitchell Declaration, Geosyntec's 2009

report was provided to the NYSDEC, and its 2010 report was provided to the NYSDEC and the

NYSDOH.  The NYSDOH made specific recommendations for further investigation at the

Phoenix Site, but never raised a methane-related issue.  S. Mitchell Decl. ¶ 12; Reiter Decl ¶ 44

During a site visit at the Phoenix Site in November 2013, at which representatives of the

NYSDEC *and Apex and Phoenix* were present, methane was never even discussed.  Golder's

RI/FFS Work Plan, submitted to the NYSDEC and the NYSDOH in December 2013, did not

address any methane-related investigation, and the agencies did not require any further

investigation into methane at the Phoenix Site.[10]  Despite receiving timely and complete reports

of the methane in the soil at the Phoenix Site, neither agency has ever raised a concern about the

safety of the Phoenix Site or its tenants arising from methane.

### I.   PHOENIX IS SEEKING RELIEF THAT IT WOULD ACHIEVE IF IT WON THIS CASE ON THE MERITS

By this motion, Phoenix seeks to require Defendants to remediate Phoenix's property on

an expedited and emergency basis.  *See* Phoenix's proposed order.  That relief is essentially what

it seeks by its complaint in this case.  But under this Court's Scheduling Order, fact discovery

does not conclude until four months from now.  Reiter Decl. ¶ 84; Reiter Ex. 67.  Quanta has not

yet taken Exxon's 30(b)(6) deposition with respect to the Pratt Works — which had been

---

[10] Although Phoenix received a copy of the RIFFS/WP in early December 2013, to Quanta's knowledge, they did not submit any requests or comments to the NYSDEC on the RIFFS/WP, including requests for further methane testing to be conducted.  Reiter Decl. ¶ 81.

scheduled for November 19-21 (Reiter Decl. ¶ 6; Reiter Ex. 4)  until Phoenix's instant motion interceded, a key witness from Phoenix who worked closely with its environmental consultants has not yet been deposed, (Reiter Decl. ¶ 32), and expert discovery has yet to begin.  Ordering ultimate relief on such an incomplete record would be error under any circumstances.  Doing so given the issues explained herein would be completely unjustified, fundamentally unfair to Quanta, and erroneous.

## **ARGUMENT**

"A party seeking a preliminary injunction must demonstrate (1) that it will be irreparably harmed in the absence of an injunction, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits of the case to make them a fair ground for litigation, and a balance of hardships tipping decidedly in its favor."  *Christie-Spencer Corp. v. Hausman Realty Co.*, 118 F. Supp. 2d 408, 417-18 (S.D.N.Y. 2000) (denying motion for preliminary injunction on a RCRA claim).  A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original) (citation and internal quotation marks omitted).[11]

The movant's already-heavy burden is even weightier when, as here, the movant seeks a *mandatory* preliminary injunction.  When seeking a mandatory preliminary injunction, the plaintiff must prove entitlement to the relief requested by "heavy and compelling" evidence, and show not just a "likelihood" of success on the merits but a "clear showing" that it is entitled to

---

[11]  The movant's burden is as heavy under Prong 2(b) as it is under Prong 2(a).  A party proceeding under 2(b) — by attempting to show that there are sufficiently serious questions regarding the merits rather than demonstrating a likelihood of success on the merits — must additionally establish that the balance of hardships tips "decidedly" in its favor.  *Christie-Spencer*, 118 F. Supp. 2d at 417-18; *see also Almontaser v. N.Y.C. Dep't of Educ.*, 519 F.3d 505, 508 (2d Cir. 2008) (affirming district court's denial of preliminary injunction and stating a party must show a "balance of hardships tipping decidedly in plaintiff's favor") (citation and internal quotation marks omitted).

19

the requested relief.  *See Wilson v. Amoco Corp.*, 989 F. Supp. 1159, 1171 (D. Wyo. 1998)

(citation omitted); *accord Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 405-06 (2d Cir. 2011)

(citation omitted).

      This burden is deliberately heavy and "granted sparingly, because mandatory injunctions

are more burdensome than prohibitory injunctions, and disturb the status quo prior to final

adjudication." *Christie-Spencer*, 118 F. Supp. 2d at 418 (citation omitted). Most preliminary

injunctions are prohibitory (*id.*), and normally courts grant them to retain the status quo

"temporarily while the court appraises the strength of the plaintiff's claim." *Mullis v. Arco*

*Petroleum Corp.*, 502 F.2d 290, 293 (7th Cir. 1974). For the rare mandatory injunction, which

"disturb[s] the status quo, by requiring some positive act" before discovery is complete, the

movant must make an extraordinarily compelling showing of entitlement. *Wilson*, 989 F. Supp.

at 1171.

      "It is generally inappropriate for a federal court at the preliminary-injunction stage to

give a final judgment on the merits." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)

(citations omitted).  Thus, the "heightened evidentiary burden also must be met where the

issuance of the injunction would provide the plaintiffs with substantially all the relief that would

be available to them following success on the merits." *Wilson*, 989 F. Supp. at 1171 (citation

omitted).  In *City of Newburgh v. Sarna*, which involved alleged violations of the Clean Water

Act, the plaintiff sought an injunction against defendant developer that would, *inter alia*, compel

a redesign of defendant's storm water management system and the removal of certain structures

from city property.  690 F. Supp. 2d 136, 145 (S.D.N.Y. 2010), *aff'd in part, app. dismissed in*

*part*, 406 F. App'x 557 (2d Cir. 2011).  The court denied the plaintiff's motion for a mandatory

preliminary injunction because "the preliminary relief sought ... [was] largely the same as the ultimate relief sought by Plaintiff in its Complaint." *Id.* at 175.

Similarly, "[u]ltimate findings of liability should be made only after all parties have had ample opportunity to employ the liberal discovery processes offered by the Federal Rules and to otherwise prepare the matter in detail for presentation to the Court in a manner conducive to sound and deliberate legal determination." *Francisco Sanchez v. Esso Standard Oil Co*., 572 F.3d 1, 20 (1st Cir. 2009) (citation and internal quotation marks omitted). Here, Quanta has not yet had this opportunity — it has not even had the opportunity to depose Exxon about the history of the Pratt Works and the contamination therefrom — and crucial discovery on ultimate issues of fact remains outstanding. In *Francisco Sanchez*, the court concluded that the district court's order granting a preliminary injunction "was a 'de facto' consolidation, without notice, which [the  appellate court could not] condone." *Id.* at 19 (*citing T.M.T. Trailer Ferry, Inc. v. Union De Tronquistas De P.R., Local 901*, 453 F.2d 1171, 1172 (1st Cir. 1971) ("even where there was no indication that [a party] would have produced further testimony if notified earlier that the entire case would be disposed of after the preliminary injunction hearing, this did not sanction the court in changing, *sub silentio*, the nature of the game at halftime") (internal quotation marks omitted)).  A preliminary injunction would be similarly premature and inappropriate here.

By contrast, however, there are myriad other cases in which a request for a preliminary injunction was *denied* — including one in which it was undisputed that a gasoline spill migrated from a gas station site to a neighboring site underneath a church, there was evidence that gasoline vapors existed under the church building, *and children in the church reported smelling gas* and becoming nauseous.  *See Grace Christian Fellowship v. KJG Invs. Inc.*, No. 07-C-0348, 2009 WL 2460990, at *12 (E.D. Wisc. Aug. 7, 2009) (denying RCRA preliminary injunction

because church did not show that gasoline vapors created an imminent and substantial endangerment to health or the environment); *see also Tilot Oil, LLC v. BP Prods. N. Am., Inc.*, 907 F. Supp. 2d 955, 967 n.16 (E.D. Wisc. 2012) (denying plaintiff's motion for summary judgment on its RCRA claims and observing: "Ultimately, [plaintiff's] argument appears to be that [defendant] is simply not doing enough regarding the speed of cleanup.  However, RCRA is not intended to remedy such a situation so long as there is no potentially imminent and substantial endangerment").

In *Tri-Realty Co. v. Ursinus Coll.*, Civ. No. 11-5885, 2013 WL 5298469, at *9-12 (E.D. Pa. Sept. 19, 2013), the court denied plaintiff's motion for a mandatory preliminary injunction on a RCRA claim for the same reasons that Phoenix's motion must be denied: (1) plaintiff failed to show that oil on its property was a real harm and thus that there was any imminent danger, (2) plaintiff failed to show that the contamination was caused by defendant, (3) no irreparable harm was present because plaintiff failed to establish an exposure pathway, (4) the government agency's knowledge of events and conditions at the site weighed against finding of imminent and substantial harm, and (5) the court "recognize[d] that [plaintiff] can perform its own investigation on its property, subject to PADEP oversight, and later seek reimbursement if [defendant] is ultimately found liable for the contamination."   The same is true here.

Many of the cases Phoenix relies upon denied preliminary injunction requests.  *See, e.g., Christie-Spencer*, 118 F. Supp. 2d at 417-25 (denying preliminary injunction request in RCRA action); *Francisco Sanchez*, 572 F.3d at 4, 19-20 (reversing grant of preliminary injunction on RCRA claim because, even though the District Court held a two-day hearing, "liability [had] been summarily determined without discovery [and] without the benefit of a trial on the merits"); *Buchholz v. Dayton Int'l Airport*, No. C-3-94-435, 1995 WL 811897, at *26 (S.D. Ohio Oct. 30,

1995) (denying request for mandatory preliminary injunction on RCRA claim, and ordering only a prohibitory injunction); *see also U.S. v. Apex*, No. 05-CV-242, 2008 WL 2945402, at *1 (S.D. Ill. Jul. 28, 2008) (granting final injunction only after a 17-day bench trial; no preliminary injunction granted). Moreover, Phoenix's argument that "[u]nder similar circumstances, the court in *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.* found an injunction necessary to avoid irreparable harm," Mem. at 7, citing 263 F. Supp. 2d 796, 873 (D.N.J. 2003), *aff'd*, 399 F.3d 248 (3d Cir. 2005), misrepresents the circumstances of that case and its applicability here, since, in *Interfaith*, the relief granted was a *permanent* injunction following a *full trial on the merits*; there was no preliminary injunction at issue there. 263 F. Supp. 2d at 802.

Under FRCP 65(c), where a court issues a preliminary injunction, the movant must "give security in the amount that the Court considers proper to pay costs and damages sustained by any party to have been wrongfully enjoined or restrained." *See Francisco Sanchez*, 572 F.3d at 22 n.16. In other words, if this Court orders injunctive relief, Phoenix *must* post a bond sufficient to cover fully the cost of complying with the order.

## I. PHOENIX HAS NOT MADE A "CLEAR SHOWING" THAT IT CAN SUCCEED ON THE MERITS

> Notwithstanding the broad powers of RCRA's citizen suit provision, the commencement of a RCRA suit does not automatically warrant entry of an injunction.

*Christie-Spencer*, 118 F. Supp. 2d at 420.

As in *Christie-Spencer*, the plaintiff here "is not likely to succeed on the merits of its RCRA claim." *Id.* "In most cases brought under the RCRA, plaintiffs want to force site owners and operators to *begin* a cleanup (or stop dumping and begin a cleanup)." *Id.* (emphasis in original). Here, as in *Christie-Spencer*, Quanta and ExxonMobil — with the guidance of the

NYSDEC — have *already* commenced cleanup[12] by, *inter alia*, working with consultants to conduct extensive testing and formulating the most effective method for ensuring a proper cleanup.  S. Mitchell Decl. ¶¶ 6-17; Simon Decl. ¶¶ 11, 14-15, 18, 46-47.  And, operations on the Quanta Site ceased decades ago.  Reiter Decl. ¶¶ 66-67.

Inexplicably relying upon *Christie-Spencer*, Phoenix requests the same relief that was *denied* and which should similarly be denied here.  *See Christie-Spencer*, 118 F. Supp. 2d at 420 ("Christie wants me to declare that the clean-up mechanism chosen by [Defendant] and approved by the DEC for use at the Site poses an imminent and substantial danger because it will not adequately clean the ... contamination.... I cannot make such a finding ....").  Phoenix suggests that the investigation and remediation at the Phoenix Site, which is already underway and being conducted under the direct supervision of the NYSDEC, is, in *its* judgment, inadequate, and requests premature and extreme measures, which are not narrowly tailored to meet conditions on the Phoenix Site.  Simon Decl. ¶¶ 18-24.  Phoenix's arguments simply do not satisfy the standards necessary for it to obtain a mandatory preliminary injunction.

A.   THERE IS NO "IMMINENT DANGER"

To succeed on its RCRA claim, plaintiff must show, *inter alia*, that the defendant "has contributed or ... is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste" as defined by RCRA and that "the solid or hazardous waste" in question may pose "an imminent and substantial endangerment to health or the environment."  42 U.S.C. § 6972(a)(1)(B).  To obtain a mandatory preliminary injunction, before discovery is even complete, the plaintiff must meet the even higher burden of demonstrating by "heavy and compelling" evidence, and show not just a "likelihood" of success

---

[12] The investigatory work with the NYSDEC on the Phoenix Site first began as a corollary to the investigation on the adjacent Quanta Site.  The cleanup remedy at the Quanta Site is scheduled to commence construction this week.  Coslett Decl. ¶ 2.

on the merits but a "clear showing" that it is entitled to the requested relief.  *See Wilson*, 989 F. Supp. at 1171; *accord Cacchillo*, 638 F.3d at 405-06.

There is no imminent danger of harm here.  A "clear showing" of the presence of "imminent danger" is both a critical element of Phoenix's RCRA claim, as well as a key element required to establish the possibility of irreparable harm,[13] and Phoenix's utter inability to satisfy this element is fatal to its motion.  Phoenix's arguments about the speculative threat of some harm are unsupported by the facts or by sound science; Quanta and Exxon and other parties have been investigating, and the experts at NYSDEC and NYSDOH have not directed any further action with respect to the presence of methane at this time, further confirming that no imminent danger exists.  Simon Decl. ¶¶ 11-24; S. Mitchell Decl. ¶¶8, 12-13, 15-17.

Even more telling, Phoenix's own inaction reveals its true belief that there is no imminent danger.  Reiter Decl. ¶¶ 52-60. Each of these factors is explored in greater depth below. Separately or together they lead to the unavoidable conclusion that no imminent danger exists (and thus no irreparable harm), and therefore no mandatory preliminary injunction may issue.

1.    **Quanta Has Been Investigating And the Environmental Experts Confirm That There Is No Imminent Danger**

On or about May 2002, Quanta and Exxon, along with other parties, collectively referred to as the Quanta Site Administrative Group ("QSAG"), entered into an Order on Consent with the NYSDEC regarding contamination on or under the Quanta Site.  Reiter Decl. ¶ 69.  The NYSDEC ordered the QSAG to conduct a Remedial Investigation ("RI") and Feasibility Study ("FS") to investigate the nature and extent of contamination migrating from the Quanta Site,

---

[13]   In connection with demonstrating irreparable harm, Phoenix was also required, but failed, to show additional elements, for example, the inadequacy of its remedy at law — CERCLA — and that it did not unduly delay in seeking to remedy the harm.  These elements are discussed in greater detail in Section II, below.  If Phoenix fails to demonstrate *any* of these elements, its motion must fail, and as demonstrated in this Section, Phoenix cannot establish that there is any imminent danger such that it has met either its RCRA "imminent and substantial" burden or its FRCP 65 "irreparable harm" burden.

which included investigative work on the Phoenix Site. *Id.* From approximately 2003 through 2005, the QSAG performed the RI and the FS, which included investigation on the Phoenix Site. *Id.* The cleanup remedy at the Quanta Site will commence construction of an LNAPL extraction system this week. Coslett Decl. ¶ 2.

In June 2005, the QSAG submitted a Remedial Investigation Report (the "RI Report") to the NYSDEC. *Id.* ¶ 71. In or about December 2005, the group of third parties who now own the Quanta Site — DMJ, Cresswood Environmental Consultants and 37-80 Review, LLC (collectively "Cresswood") — entered the Quanta Site into the NYSDEC Brownfields Clean-up Program pursuant to the terms of a confidential settlement agreement. *Id.* ¶ 72. In February 2007, following submittal and review of the RI Report and the FS, the NYSDEC issued its Record on decision ("ROD"), ordering remediation of the contamination on and around the Quanta Site, including the Phoenix Site. *Id.* ¶ 73.

Golder has completed its assessment of the environmental on the Phoenix Site as part of the NYSDEC-directed remedial investigation of the property. S. Mitchell Decl. ¶¶ 8-13, 15-17. In December 2013, Golder developed a Remedial Investigation and Focused Feasibility Study Work Plan (RI/FFS Work Plan), which was approved by NYSDEC and which did not include a survey of the building for methane. S. Mitchell Decl. ¶ 8. Golder is now finalizing the investigation at the Phoenix Site, under the direction of the NYSDEC and plans to submit a report later this week. S. Mitchell Decl. ¶ 23.

Courts routinely deny preliminary injunctions in these circumstances. *See, e.g., Christie-Spencer*, 118 F. Supp. 2d at 421 ("The fact that the site will be covered by a concrete slab while the process is carried out means that no noxious vapors will injure human health"); *id.* at 423 (noting the defendant's expert Pease's statement that "there is no exposure pathway");

*Scotchtown Holdings LLC v. Town of Goshen*, No. 08-CV-4720, 2009 WL 27445, at *3 (S.D.N.Y. Jan. 5, 2009) ("protection of health and the environment from the improper disposal of solid waste is RCRA's objective, not protection of plaintiff's plans to develop its property") (citation omitted).[14]

**2.      Soil Vapor Issues Are Being Addressed Via the NYSDEC Process; This Court Should Not Substitute Its Judgment for the NYSDEC, Which Has Elected Not To Require the Measures Phoenix Now Advocates**

"It is not the court's role to second-guess scientific judgments of a governmental agency that is responsible for protecting public health." *Smith v. Potter*, 187 F. Supp. 2d 93, 97 (S.D.N.Y. 2001) (citation and internal quotation marks omitted).[15]  Here, the soil vapor issues are explicitly being addressed via the NYSDEC process and all of the data that Fort cites in Apex's August 22, 2014 report (and in his Declaration) is before NYSDEC.  Yet, the NYSDEC has never required the Defendants to take the kinds of measures that Phoenix now seeks to impose.

---

[14]  Plaintiffs cite cases on pages 5-6 of their memorandum for the proposition that courts have granted preliminary injunctions where the presence of methane poses an imminent risk of explosion.  The cited cases, however, are completely irrelevant to this motion.  *See, e.g.*, *Bank of New York Mellon Trust Co., N.A. v. Morgan Stanley Mortg. Capital Inc.*, No. 11 Civ. 0505, 2013 WL 3146824 (S.D.N.Y. Jun. 19, 2013) (involving the presence of methane gas in a Wal-Mart store in the context of defendant's potential breach of representations and warranties made to plaintiffs regarding a mortgage loan); *Plateau Mining Corp. v. Fed. Mine Safety & Health Comm'n*, 519 F.3d 1176 (10th Cir. 2008) (reversing a citation issued after a methane explosion in a mine).  Further, the facts and circumstances of the cited cases where a preliminary injunction was granted due to an imminent risk of explosion are drastically different, and cannot be analogized.  *See, e.g.*, *Columbia Gas Transmission Corp. v. Tarbuck*, 845 F. Supp. 303 (W.D. Pa. 1994) (directing defendant to remove dirt and rock from a right-of-way in order to preserve access for the testing and operating of a gas pipeline); *Columbia Gas Transmission, LLC v. Robert Borror Logging, LLC*, No. 2:12-CV-39, 2012 WL 2294870 (N.D. W.Va. Jun. 15, 2012) (enjoining a logging company from crossing a right-of-way without complying with appropriate regulations under the National Gas Pipeline Safety Act, so as not to damage a pipeline and risk explosion); *Texas E. Transmission v. Perano*, No. Civ.A. 04-3915, 2005 WL 289932 (E.D. Pa. Feb. 4, 2005) (prohibiting defendants from maintaining a mobile home and excavating in the area above and immediately surrounding plaintiff's pipelines).

[15]  In *Smith*, the court deferred to the CDC's conclusion that there was no danger and, citing to *Christie-Spencer*, denied plaintiffs' motion for a preliminary injunction under RCRA.  *Smith v. Potter*, 187 F. Supp. 2d at 97.  The court wisely observed: "I do not have the medical knowledge or expertise to become a Monday morning quarterback here," and declined to "butt in" where the CDC was "complying with its responsibilities under the law."  *Id.*  Similarly here, Defendants have been working to investigate and remediate the Site in consultation with the NYSDEC and fully cooperating with the NYSDEC, which is itself carrying out its responsibilities.  There is no reason to second guess this process now.

27

And NYSDEC is well-aware of Phoenix's concerns.  For example, in August of 2006,

Phoenix's counsel wrote to the NYSDEC with comments on the Proposed Remedial Action Plan

for the Quanta Site and specifically objected to various aspects of the PRAP as it relates to

Phoenix's property.   Reiter Ex. 65 at DEFS0301223-231.  In the February 2007 Record of

Decision by the NYSDEC regarding the remedy for the Quanta Site, the NYSDEC included a

detailed response to and rebuttal of Phoenix's comments.  *Id.*  The NYSDEC concluded that

characterization of the Phoenix Site was reasonable "to the degree practicable."  *Id.* at

DEFS0301224.  The NYSDEC specifically stated that off-site soil vapor intrusion studies will be

required, which resulted in the work performed by Golder just this Spring of 2014, and which

will be reported to NYSDEC within the next week.  In short, NYSDEC knows exactly what

Phoenix is complaining to this Court about and is *presently* involved in taking the actions that it

believes are necessary to protect human health and the environment at the Phoenix Site.

Undoubtedly the NYSDEC will require immediate action if it perceives any "imminent danger,"

and it is better situated to make that determination than either the litigants or the Court.

As in *Christie-Spencer*, Phoenix is asking the Court to substitute its expertise for that of

NYSDEC, which is aware of all the relevant facts.  Just like this case, the plaintiff in *Christie-*

*Spencer* had submitted comments to the NYSDEC on the cleanup plan urging more than the

NYSDEC eventually required.  *Christie-Spencer*, 118 F. Supp. 2d at 415.  And just as in

*Christie-Spencer*, the motion for a mandatory preliminary injunction should be denied.[16]

---

[16]  *Accord Kara Holding Corp. v. Getty Petroleum Mktg., Inc.*, No. 99 Civ. 0275, 2004 WL 1811427, at *12 (S.D.N.Y. Aug. 12, 2004) (when agency overseeing remediation "has found that systems currently in place are sufficient to abate the danger, no further action is necessary"); *87th St. Owners Corp. v. Carnegie Hill-87th St. Corp.*, 251 F. Supp. 2d 1215, 1219-20 (S.D.N.Y. 2002) (a mandatory injunction is not necessary where remedial action is already in place to address the endangerment complained of).

### 3.   Purely Speculative "Danger" Does Not Satisfy RCRA or the Rigorous Mandatory Preliminary Injunction Requirements

"[A] court must be cautious when considering the propriety of preliminary injunctive relief under [RCRA § 6972].  Indeed, an imminent and substantial danger for purposes of a RCRA claim does not exist if the risk of harm is remote in time, speculative in nature, and de minimis in degree."  *Smith v. Potter*, 187 F. Supp. 2d at 98 (citing *Wilson v. Amoco*, 989 F. Supp at 1172) (internal quotation marks omitted); *see also Christie-Spencer*, 118 F. Supp. 2d at 420 ("Courts will not find that an imminent and substantial endangerment exists if the risk of harm is remote in time, completely speculative in nature, or de minimus in degree") (citation and internal quotation marks omitted).

It is hard to imagine a danger more speculative in nature than one that has allegedly been ripe for decades, and yet which has never materialized into the harm (or any version of the harm) that the movant claims is "imminent."

Phoenix itself has known about the presence of the specific purported threat since at least 2004.  The information upon which Phoenix relies are vapor reports prepared by Geosyntec Consultants, Inc. in *2008* and *2010,*(Fort Decl. ¶ 21, Att. E and F), and sampling that was conducted by Golder as early as January *2013*.  *Id.* ¶¶ 10-12.[17]  Phoenix explicitly raised its purported concerns nearly 17 months ago during a Court conference (Reiter Ex. 45 at 4-5), at which Phoenix's counsel referenced the "100 percent" LEL reading, and stated that "our clients are very concerned about the current conditions out there for the tenants," and again in a letter 21 days later.  Reiter Ex. 46 at 2.  However, Phoenix itself has, despite this deep "concern," elected not to take the measures itself or to evacuate its tenants, apparently preferring not to forego its opportunity to continue collecting rent from them.

---

[17] Phoenix chose not to bring the 2004 Geomatrix report to the Court's attention in its motion papers.

In addition, an oil refinery operated on the Phoenix Site for 67 years (long before Quanta's two-year stint on the neighboring Quanta Site), and is the probable source for most of the ancient carbon found on the Phoenix Site.  Contamination from the Pratt Works oil refinery has been under the Phoenix building since it was built in 1971, and yet no fire or explosion or build-up of hazardous gases in the Building has ever occurred.[18]  This is true even though, as Phoenix contends, there are multiple "ignition sources" on its property (Mem. at 3-4, 9), and even though its tenants routinely smoke at the site.  Reiter Ex. 48 at 181:19-21.

Further demonstrating the purely speculative nature of the harm, tests conducted within the past week by Golder and observed by Phoenix's consultant Apex showed no hazardous levels of methane in the Building.  Simon Decl. ¶ 11; Simon Ex. A; S. Mitchell Decl. ¶¶ 26-29; S. Mitchell Ex. K.  The highest test — taken in a floor drain — was *135 times* lower than the LEL.  Simon Decl. ¶ 11; Simon Ex. A; S. Mitchell Decl. ¶ 28; S. Mitchell Ex. K.  Phoenix's self-interested litigation strategy and "judgment" is no replacement for scientific results, which confirm that any danger is speculative at best.  Finally, Phoenix's own failure to act — despite the possibility of civil and/or criminal actions against it in the event that, for example, it knew of a non-speculative danger to its tenants and yet failed to alert them or take other protective measures — belies its litigation claim that it believes there to exist a real, non-speculative, risk of imminent harm.

If Phoenix perceived a real danger of imminent harm, it would have taken swift action. The only explanation for Phoenix's failure to act is because it wants to avoid spending money on remedial actions on its own site that it is not guaranteed to recover from Defendants after a full

---

[18]  The only time anyone is alleged to have smelled methane onsite is when a well was being drilled into the LNAPL, at which point the drilling was simply stopped and the scent abated.  Fort Decl. ¶ 11.

determination on the merits.  Phoenix's inaction confirms that its real concern has nothing to do with a legitimate fear of imminent harm.

In short, Phoenix's failure to act confirms that there is no imminent danger (in fact, no real danger at all), and therefore Phoenix's motion cannot succeed.

### B.   PHOENIX HAS NOT PROVEN THAT DEFENDANTS ARE RESPONSIBLE FOR THE PURPORTED DANGER; SERIOUS CAUSATION PROBLEMS PLAGUE PHOENIX'S CASE

In the Second Circuit, "to affix RCRA liability to any particular defendant, [plaintiff is] … obligated to establish a link between the waste *attributable to an individual defendant* and the risk of imminent and substantial endangerment."  *Prisco v. A & D Carting Corp.*, 168 F.3d 593, 608-09 (2d Cir. 1999).  Therefore, Phoenix must establish a link between the waste *attributable to Quanta* — as opposed to Mahler and Triplex, who collectively operated at the Quanta Site for 47 years prior to Quanta's arrival — and any risk of explosion allegedly present today at the Phoenix Site.  That is, Phoenix must show that the leaks/spills that *Quanta itself* allegedly deposited into the soil — during its *two* years of operation — (i) made its way from the Quanta Site to the soil beneath Phoenix's property, and then (ii) was converted into the actual methane that is allegedly the source of the imminent and substantial endangerment.  Serious causation problems plague Phoenix's ability to make this showing — indeed, it has not even tried to do so —and are fatal to its ability to obtain preliminary, mandatory, relief now.

Phoenix's theory of how waste reached the Phoenix Site is that it *migrated* there from the Quanta Site.[19]  But Phoenix does not even try to prove that waste released by Quanta, as opposed to Mahler or Triplex, migrated to the Phoenix Site.  Indeed, it is notable that over a dozen of Phoenix's exhibits pertain to shipments of waste *to the Mahler operation* by Exxon.  Phoenix's

---

[19] Reiter Ex. 63; Reiter Decl. ¶¶ 43-46 (phrasing its allegations in passive voice, and alleging in ¶ 43 that hazardous substances "were released and disposed of at the Quanta Site" but not alleging that Quanta's wastes as opposed to Triplex's or Mahler's actually entered the Phoenix Site).

claim is that waste was released *at the Quanta Site* at some point and that *some* of that waste migrated to the Phoenix Site, and that *some* of it may even have migrated while Quanta *owned* the Property.  But that is *legally* insufficient to impose liability under RCRA (or CERCLA) onto Quanta.

Phoenix's theory of the case is known, in CERCLA/RCRA terms, as "passive migration" — that contaminants migrated from the Quanta Site to the Phoenix Site during a time when Quanta owned it.  But the cases are clear that that is not enough — Phoenix must prove not just that waste migrated from Quanta to Phoenix while Quanta owned the Quanta Site but that it was Quanta's waste and not Mahler's previously-disposed waste or Triplex's previously-disposed waste that did the migrating.  And this Phoenix cannot (and does not try) to do.  *See, e.g.,* Fort Decl., Att. D at ES-1 to ES-2 (arguing without proving that the contaminants at the Phoenix Site originated at the Quanta Site, but nowhere proving that Quanta was the party that put the contaminants now found on the Phoenix Site into the ground in the first place).

Passive migration — the theory that wastes migrated from a defendant's property during the time that he owned it without proof that they were his wastes — does not create liability under RCRA or CERCLA, because it does not establish that the defendant "has contributed … to the ... handling, storage, treatment, transportation, or disposal of any solid or hazardous waste" as required by RCRA § 6972(a)(1)(B).  *See ABB Indus. Sys., Inc. v. Prime Tech., Inc.*, 120 F.3d 351, 359 (2d Cir. 1997) (affirming dismissal of RCRA § 6972 claim and holding that prior owners and operators of a site are not liable under CERCLA for mere passive migration); *see also Delaney v. Town of Carmel*, 55 F. Supp. 2d 237, 257 (S.D.N.Y. 1999) (dismissing plaintiff's claims against certain defendants under RCRA and holding that "precluding liability for the passive migration of substances that are already on a piece of property is consistent with the

plain meaning of both the words 'disposal' and 'contributed to' as they are used in RCRA");

*Murtaugh v. New York*, 810 F. Supp. 2d 446, 474 (N.D.N.Y. 2011) (dismissing a RCRA Section

6972(a)(1)(B) claim after recognizing that "passive migration of contamination dumped in the

land prior to defendant's ownership does not constitute disposal") (citations and internal

quotation marks omitted).

      *ABB v. Prime Tech* is the leading case.  In *ABB*, "[a]fter discovering that a piece of real

property that it owned was contaminated ..., plaintiff sued several companies that had previously

controlled the property ...."  120 F.3d at 353.  The Second Circuit affirmed the district court's

grant of summary judgment to certain defendants when ABB could not show that it was their

waste which migrated.  "[A]lthough hazardous chemicals may have gradually spread

underground while the dismissed defendants controlled the property (passive migration), we

conclude that prior owners are not liable under CERCLA for passive migration."  *Id.* at 354.

> [D]isposal is defined as "the discharge, deposit, injection, dumping, spilling,
> leaking, or placing" of hazardous chemicals so that they may enter the
> environment.  42 U.S.C. § 6903(3).  None of these terms is commonly used to
> refer to the gradual spreading of hazardous chemicals already in the ground.

*Id.* at 358 (citation omitted).  "Congress knew that passive migration occurred but decided not to

impose liability for it on prior owners."  *Id.*  "Thus, we interpret the word 'disposal' as limited to

spilling, discharging, leaking, etc., and not to passive migration."  *Id.*  "If a person merely

controlled a site on which hazardous chemicals have spread without that person's fault, that

person is not a polluter and is not one upon whom CERCLA aims to impose liability."  *Id.* at

358-59.  The Second Circuit then ruled that the same test applies to RCRA (*Id.* at 359):

> To establish a violation of section 6972(a)(1)(B), a plaintiff must establish that the
> defendant "has contributed or ... is contributing to the past or present handling,
> storage, treatment, transportation, or disposal of any ... hazardous waste which
> may present an imminent and substantial endangerment to health or the
> environment."  42 U.S.C. § 6972(a)(1)(B).  Because ABB cannot show that
> General Resistance or Zero–Max spilled hazardous chemicals or otherwise

contaminated the site, ABB cannot establish that the defendants have contributed or are contributing to an endangerment to the environment.

Phoenix's failure to prove, or even allege,[20] that waste disposed by Quanta, as opposed to others' waste that passively migrated to the Phoenix Site, is fatal to its RCRA claim and means that it has no likelihood of success on that claim. Phoenix has made *no* showing, let alone a "clear showing" of any likelihood of success on the merits of the RCRA claim, as is necessary to obtain preliminary mandatory injunctive relief.

In addition to its *legal* problems arising from its failure to prove actual migration of Quanta's waste (as opposed to Mahler's or Triplex's), Phoenix faces multiple other insurmountable factual problems in establishing the required causal connection between Quanta's operations at its own site and methane allegedly present at the Phoenix Site:

- There is an obvious source much more likely than Quanta, *or even Quanta's predecessors on the Quanta Site,* to have caused the contamination that exists on the Phoenix Site: the former Pratt Oil Works, a massive 200,000 gallons *per day* oil refinery that stored 87,000,000 gallons of oil at a time. That refinery, for which Exxon has responsibility, operated on and adjacent to the Phoenix Site for approximately 67 years (from about 1882 until the end of 1949). D. Mitchell Decl. ¶¶ 4, 11-25. Shockingly, the Fort Declaration never mentions the former Pratt Works, acting as if it did not exist, when it erroneously concludes that there is "no significant source for ancient carbon other than the Quanta oil plume". Fort Att. D at 5,9.

- The Apex Report also fails to mention the extensive petroleum-related activities of the plaintiffs themselves (and their predecessors, Guinness) at the Phoenix Site. The evidence is undisputed — indeed, it was testified to by Phoenix's president — that Phoenix utilized about 5,000 gallons per month of fuel stored in two underground storage tanks to fuel its extensive fleet of vehicles from 1984-2011 and conducted ongoing maintenance of those vehicles from 1984-2000. Reiter Ex. 15 at 400:18-22, Ex. 19.

---

[20] A parties' failure to adequtaley allege facts in a complaint is futile to its claim. *See Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,* 459 U.S. 519, 526 (1983) (dismissing union's federal antitrust claim and concluding that "[i]t is not … proper to assume that the Union can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged"); *Davis v. Cuomo,* No. 1:10-CV-0220, 2010 WL 2925710, at *2 (N.D.N.Y. Jul. 20, 2010) (granting defendant's motion to dismiss because "the Court shall not assume that Plaintiff can prove facts not alleged in his Complaint") (citation omitted).

- The oil at the Phoenix Site could not have originated at the Quanta Site because no PCBs have been found at the Phoenix Site, whereas there *were* PCBs found in Quanta Site LNAPL (and soil).  PCBs move with oil, so the lack of PCBs at the Phoenix Site means that oil from the Quanta Site did not reach the Phoenix Site.  Simon Decl. ¶ 43.

- The presence of MTBE and other gasoline and diesel fuel constituents in the vicinity of Phoenix's USTs are undeniably linked to those USTs.  Simon Decl. ¶ 48.

- Soil contamination within a few feet of the surface on the Phoenix Site proves that at least some of the contamination on the Phoenix Site could not have come from the Quanta Site according to the laws of gravity.  It is not physically possible for any LNAPL which may have migrated from the Quanta Site to be found so close to the surface, because LNAPL is subject to the laws of gravity and could not flow across the Quanta / Phoenix Site line on top of the groundwater and then *rise* on its own to just below the ground surface.  The presence of LNAPL so close to the surface conclusively proves an on-site source of contamination.  Simon Decl. ¶ 32.

As Magistrate Orenstein already observed in this case: "[Y]ou can't litigate who's responsible — where the contamination on Phoenix came from without knowing what's in Phoenix.  That's going to require some discovery.…  [I]t's going to require a trial that determines where that came from."  Reiter Ex. 69; *see also* Reiter Ex. 68.

A preliminary injunction cannot be granted where such obvious questions of material fact exist.  *See Cerruti, Inc. v. McCrory Corp.*, 438 F.2d 281, 284 (2d Cir. 1971) (affirming lower court's denial of preliminary injunction motion because "this case involves serious issues which should not be determined, even preliminarily, on an incomplete factual showing by way of affidavits in the absence of clear proof of necessity for interlocutory injunctive relief") (citation omitted); *Eastin-Phelan Corp. v. Hal Roach Studios, Inc.*, 350 F. Supp. 1328, 1332 (S.D.N.Y. 1972) (denying request for preliminary injunction and noting that "[w]here doubtful issues of fact exist which may determine the result, a preliminary injunction is not in order") (citations omitted).  This rule makes perfect sense, given that the existence of such disputes renders a

plaintiff unable to make the requisite clear demonstration that success on the merits is likely. Because Phoenix has failed to meet its burden, its motion must be denied.

## II.   PHOENIX HAS NOT SHOWN ANY THREAT OF "IRREPARABLE HARM"

The irreparable harm requirement is "the single most important prerequisite for the issuance of a preliminary injunction." *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999) (per curiam) (internal quotation marks omitted).[21]   The movant bears the burden of proving, *inter alia*, that the continuing harm "cannot be adequately redressed by final relief on the merits" and, importantly, that "money damages cannot provide adequate compensation." *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (citation and internal quotation marks omitted); *see also Town of Riverhead v. CSC Acquisition-NY, Inc. (Cablevision)*, 618 F. Supp. 2d 256, 265 (E.D.N.Y. 2009) (citations omitted).

A court will not grant an injunction when the plaintiff can perform the action sought via injunction itself and then seek financial compensation from defendant should the plaintiff ultimately prevail in the action.   *See Town of Riverhead*, 618 F. Supp. at 265; *Kamerling*, 295 F.3d at 214; *see also* Wright and Miller, 11A FED. PRAC. & PROC. CIV. § 2948.1 (3d ed.) ("[A] preliminary injunction usually will be denied if it appears that the applicant has an adequate alternate remedy ....").   Phoenix is precluded from pursuing injunctive relief because the alleged imminent threat relates to vapors on Phoenix's own property.   Phoenix can take whatever

---

[21]   The "irreparable harm" showing is not lessened in an environmental case.   *See Grace Christian Fellowship*, 2009 WL 2460990, at *4, 6 (observing that, despite the existence of authority suggesting that "when a case is brought pursuant to an environmental … statute, … the primary focus shifts from irreparable harm to concern for the general public interest," the cases often cited for this proposition do not, in fact, support it; instead, "RCRA does not evidence an intent to deny courts their traditional equitable discretion").   Even Phoenix concedes that "[f]or environmental contamination cases, the test is whether … the contamination will inflict serious irreparable injury." Mem. at 5 (citing *Francisco Sanchez*, 572 F.3d at 21 (in which circuit court reversed district court's order granting a preliminary injunction); *see also Gen. Motors LLC v. Lewis Bros.*, No. 10-CV-725S, 2012 WL 3839320, at *8 (W.D.N.Y. Sept. 4, 2012) (citing *Winter v. NRDC, Inc.*, 555 U.S. 7, 22 (2008)).   Indeed, the burden upon the plaintiff is even greater when plaintiff "seeks to disturb the status quo by requiring action by the defendants." *Grace Christian*, 2009 WL 2460990, at *6 (citation omitted).

remedial action it wants and seek compensatory damages through its other claims for relief.

This has long been the rule in the Second Circuit.  For example, in *Triebwasser & Katz v. AT&T Co.*, even though the court perceived "sufficiently serious questions going to the merits to make them a fair ground for litigation," it held that "the court below committed a clear mistake of law and abused its discretion in granting the [mandatory] preliminary injunction" because "plaintiffs have an obligation to mitigate their damages," and whatever costs are expended to do so "are obviously capable of proof and therefore reparable."  535 F.2d 1356, 1358, 1360 (2d Cir. 1976).[22]  As demonstrated in Section B, above, Phoenix has the ability to itself perform the actions sought via its injunction — and has even hired environmental consultants specializing in this work who have developed plans to do so — but has chosen not to act.  Phoenix's hyperbolic cries of alarm therefore ring hollow.  Phoenix's ability to perform the work and then seek financial, monetary compensation reimbursing it for that work removes it from the realm of "irreparable harm."  *Town of Riverhead*, 618 F. Supp. 2d at 265.  "One of CERCLA's main purposes is to 'encourage private parties to assume the financial responsibility of cleanup by allowing them to seek recovery from others.'"  *W.R. Grace & Co.-Conn. v. Zotos Int'l, Inc.*, 559 F.3d 85, 94 (2d Cir. 2009) (quoting *Key Tronic Corp. v. U.S.*, 511 U.S. 809, 819 n.13 (1994)).  "CERCLA does provide property owners an avenue of reprieve; it allows them to seek reimbursement of their cleanup costs from others…."  *Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 120-21 (2d Cir. 2010) (citations and internal quotation marks omitted).  As explained in *Christie-Spencer*, "to the extent plaintiff fears that it will someday be responsible for further clean-up costs, *it has an adequate remedy at law … under both CERCLA*

---

[22] The court also observed that "[t]he injunction granted below would in effect give the plaintiffs substantially the ultimate relief they seek ... before there has been any trial of the issues," and reiterating that "equity cannot intervene where there is an adequate remedy at law".  *Triebwasser & Katz v. AT&T Co.*, 535 F.2d 1356 at 1359.

and RCRA" and therefore "Plaintiff has not shown irreparable harm" and no injunction may issue.  118 F. Supp. 2d at 425 (emphasis added).

Not only has Phoenix failed to act to remedy the harm about which it complains by, for example, implementing the measures its consultants advocate, but it also delayed for a decade in seeking injunctive relief.  "Lack of diligence, standing alone, may … preclude the granting of preliminary injunctive relief, because it goes primarily to the issue of irreparable harm ...." *Majorica, S.A. v. R.H. Macy & Co.*, 762 F.2d 7, 8 (2d Cir. 1985); *see also Asdourian v. Konstantin*, 50 F. Supp. 2d 152, 156 (E.D.N.Y. 1999) (no irreparable harm after movant waited four months before seeking a preliminary injunction); *Town of Riverhead*, 618 F. Supp. 2d at 265-66 ("[The] plaintiffs' [four month] collective delay in seeking to address the alleged injury also undermines their claim of irreparable harm").[23]

Phoenix has known about the methane under its property since at least June 2004, yet Phoenix waited until October 14, 2014 before sending defendants a letter stating its intention to seek a mandatory preliminary injunction.  This almost *ten year* delay "belies any claim that the alleged harms are so pressing as to warrant such a drastic judicial remedy." *Town of Riverhead*, 618 F. Supp. 2d at 266 (citations omitted).

Despite a feigned worry, supported by neither the environmental consultants nor the NYSDEC, Phoenix has done nothing for almost ten years to address the supposedly imminent danger lurking on its own site.  Phoenix's own inaction and delay reveals  this motion to be nothing more than a litigation strategy, rather than a real concern, and it refutes any legitimate claim of imminence or irreparable harm.  Plaintiffs' motion must be denied.

---

[23]  This rule applies with equal force in environmental cases.  *See, e.g., City of Newburgh*, 690 F. Supp. 2d at 173 (in Clean Water Act case, "Plaintiff's delay seriously undermines its attempt to convey any sort of urgency; it indicates the lack of a truly immediate threat of irreparable harm, and weighs against granting preliminary relief").

### III.   THE BALANCING OF THE HARDSHIPS WEIGHS HEAVILY IN DEFENDANTS' FAVOR

The balance of factors — including, *inter alia*, Phoenix's own ability, but failure to, take the measures it deems necessary to prevent harm; that a remedial investigation is already underway, and the NYSDEC has *not* required the drastic steps proposed by Phoenix; the relatively early stage of discovery of Exxon with respect to the former Pratt Works refinery; the lack of evidence that Quanta is legally responsible for the alleged contamination and the abundance of evidence of other sources of the contamination; the lack of evidence of a real risk of explosion and the scientific evidence to the contrary; the cost of the relief proposed by Plaintiffs; and that just this past week Defendants' consultants again tested Phoenix Site and found no cause for alarm — weighs the balance heavily against granting to Phoenix now the ultimate relief it seeks on the merits.

If Phoenix is correct that there is a danger here, and that it is fairly attributable to Quanta, Phoenix suffers no hardship by addressing the harm on its own property and then recovering the costs from Quanta in this very action (where it has already asserted CERCLA claims to recover clean-up costs).  But if Quanta is ordered now to expend the time and costs to divert resources from their ongoing remedial investigation and undertake new, onerous and unnecessary remedial action, and Phoenix turns out to be wrong, either about the threat of the harm or about Quanta's responsibility therefor, Phoenix will have achieved a victory on the merits to which it was never entitled and for which Quanta could not be easily or fully compensated (while Phoenix will be the undeserving beneficiary of increased property value at Quanta's expense).

The balance of hardships and the public interest therefore favors Defendants and militates against the issuance of a mandatory preliminary injunction.  *See, e.g., Christie-Spencer*, 118 F. Supp. 2d at 418, 423 (injunction denied as against public interest); *Triebwasser*, 535 F.2d at

1358-59 (deeming the District Court's grant of a mandatory preliminary injunction inappropriate, despite the strength of the merits of plaintiff's claims, because of "[o]ur difficulty ... with the finding that the balance of hardships tips decidedly in the plaintiff's favor").

## CONCLUSION

Phoenix falls far short of establishing each element required before a preliminary injunction may issue.  The gulf between what Phoenix must demonstrate and what it has demonstrated is even more pronounced because Phoenix seeks, not just a prohibitory injunction, but an uncommon mandatory injunction that would disturb the *status quo* (which, in this case, is the ongoing methodical investigation approved and supervised by the NYSDEC).  The proposed deviation would come at a tremendous cost to Quanta, and would prematurely award to Phoenix final relief on the merits long before it can be determined that Phoenix has a made a clear showing that it will succeed on the merits, and even before critical fact and expert discovery is complete.

There are myriad cases denying preliminary injunction requests (including many of the cases Phoenix cites), few in which a mandatory preliminary injunction is granted, and none where it is granted under the circumstances present here.  Accordingly, and for all of the foregoing reasons, Plaintiffs' motion for a preliminary injunction should be denied.

Dated:     New York, New York
           November 10, 2014

                                    ARENT FOX LLP

                                    By:   /s/ Allen G. Reiter
                                          Allen G. Reiter
                                          Donald B. Mitchell, Jr.
                                          Jennifer L. Bougher
                                          Adrienne M. Hollander
                                    1675 Broadway
                                    New York, New York  10019
                                    Phone:  212-484-3900

                                    *Attorneys for Defendant Quanta Resources
                                    Corporation*