

**Stacey H. Myers**
Attorney
Phone: 202-895-5382
SMyers@hgnlaw.com

December 22, 2014

**VIA ELECTRONIC FILING**
United States Magistrate Judge James Orenstein
United States District Court, Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

**RE:   Phoenix Beverages, Inc. v. ExxonMobil Corp., Case No. 1:2-cv-03771-JKC-JO**

Dear Judge Orenstein:

      Non-party Kelley Drye & Warren LLP ("KD"), a law firm that serves as outside counsel to Phoenix Beverages, Inc. and affiliated companies ("Phoenix"), objects to further disclosure of information from its invoices.  Quanta Resources Corp. ("Quanta") wrongly argues that the substance of KD's communications with its client (reflected in KD's invoices) must be produced because they bear on "whether Phoenix's state law damages claims are barred by the expiration of the three-year statute of limitations provided by CPLR § 214-c(2)."  Dkt. 469 at 1.  Quanta has already taken a lot of discovery concerning this defense, including the Rule 30(b)(6) deposition of Phoenix, depositions of Phoenix's officers Rodney Brayman and Gregory Brayman, and the deposition of Phoenix's Facilities Director Patrick Simeone.  Dkt. 428 at 2.  Quanta has been provided a letter from Dr. Kelly McIntosh, Phoenix's environmental consultant, describing when Phoenix learned of the injury to its property and the cause of that injury.  Dkt. 469-12.  Quanta has also taken the depositions of many individuals from *DMJ Assocs. LLC v. Capasso et al.*, which is litigation concerning the Quanta Site and its impact the Capasso Properties (to the north and southwest of the Quanta Site).  These depositions included DMJ's Managing Member, David Kushner, DMJ's attorney Barbara Guibord, and DMJ's environmental consultant, William Dunnell.  Quanta has also noticed the Rule 30(b)(6) deposition of KD, which among other things seeks testimony about the factual information provided to Plaintiffs by William Dunnell on July 11, 2002 and by Barbara Guibord on August 2, 2002, as well as factual information concerning when "Plaintiffs first become [*sic*] aware that the Quanta Site was or may be a source of contamination for the Phoenix Site and the information Plaintiffs possessed at that time."  Ex. 1 ¶¶ 8, 9 & 11(a).

      Phoenix and KD do not believe Quanta's statute of limitations defense has any merit.  Indeed, to this day Quanta attempts to deny that the Quanta Site caused any injury to the Phoenix Property.  Quanta has argued to the Court that the Phoenix Site "has barely been characterized," and that "without a complete characterization of the site, all the information necessary to know the source and extent of contamination will not be available."  Ex. 2 at 21:7-8, 22:11-14.  Quanta has also specifically denied having "sufficient knowledge and information" to admit that *any* of the LNAPL detected in the monitoring wells on the Phoenix Property was sourced on the Quanta Site.  Ex. 3.  Quanta's Rule 30(b)(6) designee also testified that "Quanta, to this day, does not know that there was migration from its site to other property," Ex. 4 at 401:19-402:15; *see also id.* at 399:16-400:12.  Thus, Phoenix believes that Quanta will not be able to demonstrate that Phoenix both knew of the injury to its property, and the cause of that injury, sufficient to have commenced the running of the statute of limitations under CPLR § 214-c during a time not covered by the Tolling Agreement.[1]

---

[1] The Tolling Agreement does not support Quanta's defense because it "does not constitute . . . any admission or

Nevertheless, KD has appropriately responded to the subpoenas Quanta has served, and worked with Quanta to provide the responsive non-privileged information. In so doing, KD has properly redacted its invoices to protect its work product and communications with its client.

In its Motion, Quanta claims that it "seeks only non-privileged time entries, not the substance of confidential attorney-client communications." Dkt. 469 at 3. The case law that Quanta has cited confirms that Quanta has already received all of the non-privileged information from the KD invoices.[2] Initially, Quanta's January 8, 2014 subpoena did not cover the KD invoices. That subpoena sought communications between KD and a list of twelve individuals and entities. Dkt. 469-2. None of KD's invoices were ever sent to any of the persons listed in that subpoena — thus these invoices were not responsive. Even so, when Quanta requested on February 24, 2014 that KD produce any billing records reflecting communications with the listed entities, Dkt. 469-17, Att. B, KD acted to accommodate that request. Prior to the disclosure of the KD invoices, KD, Quanta, and the other parties in the Phoenix Matter agreed in writing that the KD invoices would be "redacted to exclude all non-responsive and/or privileged information," and that if KD produced its billing records "neither Kelley Drye nor any of the Plaintiffs . . . will be deemed to have waived any applicable privileges." Dkt. 469-17, Att. C. Once this non-waiver agreement was signed, KD produced its invoices on June 11, 2014 in redacted form so that references to "communications with any of the third parties identified in the January 14th subpoena" were provided, but that the KD invoices were *"redacted to exclude any documentation that is privileged or non-responsive to your request,"* Dkt. 469-17, Att. D (emphasis added). KD's invoices were not "improperly redacted" as Quanta claims, but rather redacted as the parties had agreed. KD did not provide a separate privilege log, because Quanta had agreed that privileged information was not responsive and should be redacted. Dkt. 469-16 at 3 ¶ II.A (acknowledging Quanta's "understanding that non-relevant and privileged communications would be redacted" from the KD invoices). On September 16, 2014, Quanta raised an issue with respect to a limited number of the time entries. The specific concerns raised by Quanta were that the name of a KD attorney appeared to have been redacted from an entry concerning communications with a third party on 9/5/02 and the subject of a telephone call with a third party appeared to have been redacted from the 9/24/02 entry. Dkt. 469-17 Page 56 of 86. KD conducted a full review, and produced a set of invoices that addressed the few issues raised by Quanta. Dkt. 469-15. On October 24, 2014, Quanta raised additional issues, Dkt. 469-16, which KD fully addressed in its November 7, 2014 response, Dkt. 469-17.

By October 24, 2014, Quanta's focus had shifted from interest in KD's communications with the third parties listed in the subpoena to interest in communications between KD and its client. Quanta attempted to alter the non-waiver agreement by contending that attorney invoices are not privileged, and that KD must reveal more about the substance of communications with its client and work product as reflected in KD's invoices. Dkt. 469-16 Pages 5-8 of 49. Quanta also served a follow up subpoena on November 17, 2014, expressly seeking communications between KD and its client "other than attorney-client communications and materials protected by the work product privilege." Dkt. 469-3. KD repeatedly asked Quanta to "please explain what you mean by 'non-

---

acknowledgement on the part of any party that any statute of limitations, or similar defense concerning the timeliness of commencing a civil action, is applicable to the Claims," Ex. 5 ¶ 5. Communications between KD and Defendants about the Tolling Agreement were conducted in furtherance of settlement discussions, *id.* at PBQE00219757 (discussing resolution through "non-litigation alternatives"); Dkt. 469-14 (proposing Tolling Agreement so parties could work on "an amicable basis in order to resolve any potential disputes"), and thus are protected under Federal Rule of Evidence 408.

[2] Some of the cases Quanta cites do not involve the issue of attorney invoices. *Ovesen v. Mitsubishi Heavy Indust. of Am. Inc.,* No. 04 Civ. 2849 (JGK)(FM), 2009 WL 195853 (S.D.N.Y. Jan. 23, 2009); *Safeco Ins. Co. of Am. v. M.E.S., Inc.,* 289 F.R.D. 41 (E.D.N.Y. 2011); *United States v. Constr. Prods. Research Inc.*, 73 F.3d 464 (2d Cir. 1996).

privileged communications between Kelley Drye and Phoenix,'" Dkt. 469-23 Pages 4 & 9 of 17, but Quanta has not provided any support for this purported "category" of non-privileged attorney-client communications.

 The invoices produced by KD reveal the participants (both attorneys and clients) and the general subject matter of such communications (a potential environmental issue at the Phoenix Property). Quanta is not entitled to more particular information about the substance of individual conversations between KD and its clients. *See, e.g., Colton v. United States*, 306 F.2d 633, 636 (2d Cir. 1962) (inquiry into the subject matter of attorney-client communications is permissible when limited to "general responses, such as 'litigation,' 'drafting of documents,' 'tax advice' and the like, thus excluding inquiry into specific details"). Quanta has received the portions of the invoices concerning "the date and general nature of the legal services performed," *id.*; *see also Riddell Sports Inc. v. Brooks*, 158 F.R.D. 555, 560 (S.D.N.Y. 1994); *Westhemeco Ltd. v. N.H. Ins. Co.*, 82 F.R.D. 702, 707 (S.D.N.Y. 1979), which was to represent Phoenix with respect to a potential environmental issue at its property. What has been redacted are the portions of the "time records which also reveal . . . the specific nature of the services provided, such as researching particular areas of law, [which] fall within the privilege." *Riddell*, 158 F.R.D. at 560. KD's invoices show telephone calls and conferences between KD and its client, *DiBella v. Hopkins*, 285 F. Supp. 2d 394,409 (S.D.N.Y. 2003) (finding words "CALLS WITH B. HOPKINS" not to be privileged), but have been properly redacted to protect the "substance of the communications exchanged," *Westhemeco*, 82 F.R.D. at 707.

 Quanta suggests that the specific descriptions appearing in KD's invoices, which characterize KD's communications with its client and describe the work conducted by KD for its client, are unprotected by the attorney-client privilege or attorney work product doctrine. While courts may allow disclosure of billing records that contain "a relatively terse chronological recitation, and give no details with respect to the contents of communications" between an attorney and his client, *Renner v. Chase Manhattan Bank*, 2001 WL 1356192, at *8 (S.D.N.Y. Nov. 2, 2001), "bills showing services, conversations, and conferences between counsel and others are protected from disclosure." *De La Roche v. De La Roche*, 209 A.D.2d 157, 158 (N.Y. App. Div. 1994)[3]; *see also Riddell*, 158 F.R.D. at 560. To allow opposing counsel access to such invoices would "reveal the factual investigation and legal work that has been done by [the party's] attorneys" in a way that the attorney-client communication and attorney work product privileges preclude. *De La Roche*, 209 A.D.2d at 158; *see also Licensing Corp. of Am. v. NHL Players Ass'n*, 580 N.Y.S.2d 128, 129 (N.Y. Sup. Ct. 1992) ("actual bills detailing the work done by the attorneys are clearly privileged material. . . . [because such bills] are detailed in showing services, conversations, and conferences between counsel and others"); *105 Street Assocs. LLC v. Greenwich Ins. Co.*, 2006 WL 3230292, at * 6 (S.D.N.Y. Nov. 7, 2006) (recognizing invoices that are 'detailed in showing services, conversations, and conferences between counsel and others' are protected by the attorney-client privilege"). Quanta's position is inconsistent with these precedents, and seeks to undermine the specific agreement reached by the parties about how the disclosure of information from KD's invoices would occur. For these reasons, Quanta's Motion to Compel must be denied.

            Respectfully submitted,
            **Hunsucker Goodstein PC**
            /s/ Stacey H. Myers
            Stacey H. Myers

---

[3] Federal Courts in New York look to New York precedents to define the scope of the attorney-client and attorney work product privileges and have held that "New York privilege rules seem to coincide with the federal common law principles" on these issues, *Riddell*, 158 F.R.D. at 560 (citing *Licensing Corp. of Am.*, 580 N.Y.S.2d at 129).