```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
––––––––––––––––––––––––––––––––––––––x
PHOENIX BEVERAGES, INC., RODB LLC,
WINDMILL DISTRIBUTING COMPANY,
L.P., UP FROM THE ASHES, INC., and
other affiliated companies of PHOENIX
BEVERAGES, INC.,

                Plaintiffs,                          MEMORANDUM & ORDER
                                                     No. 12−CV−3771 (PKC) (JO)
        − against –

EXXON MOBIL CORPORATION,
EXXONMOBIL RESEARCH AND
ENGINEERING COMPANY and QUANTA
RESOURCES CORPORATION,

                Defendants.
––––––––––––––––––––––––––––––––––––––x
QUANTA RESOURCES CORPORATION,

                Third−Party Plaintiff,

        − against –

ACE WASTE OIL, INC., et al.,

                Third−Party Defendants.
––––––––––––––––––––––––––––––––––––––x
```
PAMELA K. CHEN, United States District Judge:

Plaintiffs Phoenix Beverages, Inc. and its affiliated companies (collectively, "Plaintiffs") instituted this action on July 31, 2012 against Defendants Exxon Mobil Corporation, ExxonMobil Research and Engineering Company (together, "Exxon"), and Quanta Resources Corporation ("Quanta") (collectively, "Defendants") based on Defendants' alleged contamination of real property (the "Property") owned and operated by Plaintiffs. (Dkt. 1 ("Compl.") ¶ 1.) Plaintiffs seek relief under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.*, and the Resource

Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq.*, as well as State law, including New York Navigation Law, N.Y. Nav. Law § 181(5). (*Id.*) Discovery is currently proceeding in this matter. (*See* Dkt. 443.)

On October 27, 2014, Plaintiffs moved for a preliminary injunction pursuant to RCRA § 7002(a)(1)(B) on the ground that Plaintiffs face a threat of imminent irreparable harm from a risk of explosion due to underground methane gas accumulating beneath the Property. (Dkts. 431 & 432.) Specifically, Plaintiffs sought to enjoin "Defendants to design and install (1) an explosive gas monitoring and alarm system to warn of the presence of methane gas within the buildings on the [] Property; (2) a sub−slab depressurization system to prevent the migration of explosive gas into the buildings on the [] Property, and (3) a system to extract and neutralize the methane gas underlying the [] Property and begin abatement of the underground plume of waste oil that is the source of the explosive gas." (Dkt. 432−1 ("Pl. Mem.") at 6).[1] Exxon and Quanta each opposed Plaintiffs' motion. (Dkt. 448 ("Exxon Mem.") & 458 ("Quanta Mem.").)

The Court heard oral argument on Plaintiffs' motion on November 19, 2014. (Dkt. 466 (Transcript of Nov. 19, 2014 Conference ("Tr.")).) At the close of argument, the Court denied Plaintiffs' request for an evidentiary hearing and motion for preliminary injunctive relief. (*Id.* at 82, 86.) This Memorandum & Order sets forth the reasons for the denial of Plaintiffs' requested relief.

*BACKGROUND*

The Property is located at 37−88 Review Avenue, Long Island City, New York. (Compl. ¶ 1.) Plaintiffs are currently leasing a warehouse and office building located on the Property (the "Building") to a number of commercial enterprises engaged in various activities, such as food

---

[1] Page numbers in this Memorandum & Order refer to the pagination supplied by the ECF docketing system.

and beverage distribution, construction, and storage for video production operations. (Pl. Mem. at 11; Dkt. 434−2 (Declaration of Rodney Brayman dated Oct. 27, 2014 ("Brayman Decl.")) ¶ 3.) Over one hundred individuals occupy the Building in connection with these enterprises, with occupants physically present twenty−four hours a day, seven days a week. (Brayman Decl. ¶ 3.)

There is no dispute that a substantial plume of Light Non−Aqueous Phase Liquid ("LNAPL"), consisting of waste oils and other contaminants, is floating on the water table beneath the Property and the Building. (*See* Dkt. 433 (Declaration of Tomlinson Fort dated Oct. 27, 2014 ("Fort Decl.")) ¶¶ 8, 13 & Ex. C; Dkt. 447 (Declaration of John A. Simon dated Nov. 9, 2014 ("Simon Decl.")) ¶ 3.) It is further undisputed that this subsurface LNAPL is generating methane gas through biodegration and volatization, and that methane consequently is accumulating in the "sub−slab" between the concrete foundation of the Building and the LNAPL plume. (Fort Decl. ¶¶ 14, 17; Dkt. 445 (Declaration of Stuart Mitchell dated Nov. 10, 2014 ("Mitchell Decl.")) ¶¶ 7, 10, 21.)

Plaintiffs' Complaint alleges that an adjacent site located at 37−80 Review Avenue, Long Island City, New York and formerly owned by Quanta (the "Quanta Site") is the source of the LNAPL contamination underneath the Property.[2] (Compl. ¶¶ 19-20, 41, 43, 52, 57.) From around 1970 to 1981, Plaintiffs allege that the Quanta Site operated as a disposal, storage, and transfer facility for "hazardous wastes, solid wastes and hazardous substances." (*Id.* ¶¶ 33−34.) According to Plaintiffs, Exxon and/or predecessor companies arranged for the disposal of hazardous substances, including oil slop, from Exxon facilities to the Quanta Site at least from

---

[2] The responsibility for the contamination on the Property is in sharp dispute and will be a subject of ongoing discovery. (*See* Tr. 31; Pl. Mem. at 14−16; Quanta Mem. at 6−12, 31−35; Exxon Mem. at 16, 31−32.) Among Defendants' contentions is that activities that took place on the Property, including the operation of an oil refinery on the Property from 1882 until 1949, account for at least part of the contamination. (Simon Decl. ¶ 25; Tr. 32, 40−41; *see generally* Dkts. 444 & 459.)

1975 to 1980. (*Id.* ¶¶ 24, 35−37.) Plaintiffs further allege that the migration of contaminants to the Property is the result of Defendants' inadequate methods for storage and treatment at the Quanta Site. (*Id.* ¶¶ 43−44, 47.)

With Plaintiffs' knowledge or participation, the Property and Building have been subject to an extensive program of testing for concentrations of potentially explosive vapors, including testing for methane at the lower explosive limit ("LEL").[3] In 2002, the New York Department of Environmental Conservation ("DEC") became involved in investigations of contamination at the Property in connection with remediation of the neighboring Quanta Site. (Mitchell Decl. ¶ 3; Exxon Mem. at 22; Pl. Mem. at 6.) Sampling activities were conducted at the Property as early as June 2004. (Dkt. 450 at Ex. 33 (letter from Plaintiffs' counsel dated June 29, 2004 discussing testing for explosive vapors on the Property).) In August 2004, an indoor air screening was performed at the Building after the Building was closed for a period of thirty−six hours to allow vapors to accumulate. (Simon Decl. ¶ 12.) All LEL readings from this screening were at zero, meaning that no combustible gases were detected inside the Building. (*Id.* ¶ 13.)

The DEC also has been overseeing the investigation of the Property since 2009 in connection with the preparation of remedial recommendations relating to contaminants on the Property. With the involvement of the DEC, the parties have engaged consultants to perform multiple studies on the Property, including: soil vapor sampling program from December 2009 to February 2010 (Mitchell Decl. ¶¶ 6−7), in May 2014 (Fort Decl. ¶ 22 & Ex. D), and in June

---

[3] The LEL is the lowest level at which a combustible gas will ignite if an ignition source is present. (Simon Decl. ¶ 11.) In other words, at or above the LEL, gas or vapor is concentrated enough to ignite. (Fort Decl. ¶ 15.) The explosive range of methane is 5−15 percent in air by volume. (Fort Decl. ¶ 16; Mitchell Decl. ¶¶ 7, 29.) Any concentration of methane that is 5 percent or greater in the air will register as 100 percent LEL on a typical LEL meter, indicating that methane is present at or above the 5 percent concentration that presents an explosion risk. (Fort Decl. ¶ 16; Mitchell Decl. ¶¶ 11, 21.)

2014 (Fort Decl. Ex. D), indoor air investigations of the Building in January 2010, March 2014, and November 2014 (Mitchell Decl. ¶¶ 9, 20, 27−29; Simon Decl. ¶¶ 11, 14), as well as the installation of, and sampling from, monitoring wells inside the Building in January 2013 and in April 2014 (Mitchell Decl. ¶ 21; Fort Decl. ¶¶ 10, 13, 17, 20−23). Evaluation of methane levels in the subsurface of the Property consistently revealed concentrations below ground that exceeded the LEL for methane. (Mitchell Decl. ¶¶ 7, 21; Fort Decl. ¶¶17, 20−21).

Data generated from air samples taken within the Building, on the other hand, did not disclose levels of methane that approached the LEL. (*See, e.g.*, Mitchell Decl. ¶¶ 10−11, 28; Simon Decl. ¶¶ 10−11; 14−15.) For instance, indoor air sampling conducted in January 2010 did not measure methane in concentrations above 1 part per million, with the exception of samples from sump and floor drains, which registered methane at 500 parts per million, or 100 times below the LEL. (Mitchell Decl. ¶¶ 10−11; Simon Decl. ¶¶ 14−15.) Indoor air sampling performed more recently in November 2014 at thirty−two locations within the Building similarly did not detect methane, except for in a floor drain at a concentration of 370 parts per million, which is almost 100 times below the LEL. (Simon Decl. ¶ 11; Mitchell Decl. ¶¶ 27−29; Fort. Decl. ¶¶ 25−27.)

In or around November 2014, Defendants and other third parties submitted a remedial investigation report regarding the Property to the DEC for review and approval of a remedial plan. (Tr. 49−50; Mitchell Decl. ¶ 23; Exxon Mem. at 10.) The DEC also received copies of interim reports documenting findings from sampling conducted on the Property. (*See, e.g.*, Mitchell Decl. ¶¶ 12, 15.) Thus far, the DEC has not required immediate action by any party to address methane at the Property. (*See, e.g.*, Tr. 49−50; Mitchell Decl. ¶¶ 12, 15−16.)

5

*DISCUSSION*

A.   Resource Conservation and Recovery Act (RCRA)

RCRA is a comprehensive statute governing the treatment, storage, and disposal of hazardous waste. *City of Chicago v. Envtl. Defense Fund*, 511 U.S. 328 (1994). Its primary purpose is "to minimize the present and future threat [posed by hazardous waste] to human health and the environment." 42 U.S.C. § 6902(b). A citizen may bring suit under RCRA "against any person, including . . . any past or present generator . . . who has contributed or who is contributing to the past or present handling . . . of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." *Id.* § 6972(a)(1)(B). "[T]he 'imminent and substantial endangerment' standard is a broad one" and "'is intended to confer upon the courts the authority to grant affirmative equitable relief to the extent necessary to eliminate any risk posed by toxic wastes.'" *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 210 (2d Cir. 2009) (internal quotation marks omitted). "No matter how broadly read, however, the text of 42 U.S.C. § 6972 requires the presence of solid or hazardous waste that may present an 'endangerment' that is 'imminent' and 'substantial.'" *Id.*

Section 7002(a)(1)(B) of RCRA, which Plaintiffs invoke in support of their motion, permits a district court "to order [a person who may have contributed to endangerment] to take such . . . action as may be necessary." Both prohibitory and mandatory injunctions may properly be issued under this provision. *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 484 (1996). In determining whether to issue an injunction under RCRA, Courts have applied traditional equitable principles. *See, e.g.*, *Grace Christian Fellowship v. KJG Invs. Inc.*, No. 07–0348, 2009 WL 2460990, at *6 (E.D.Wis.2009); *Wilson v. Amoco Corp.*, 989 F. Supp. 1159, 1177 (D.Wyo.1998) (citing cases).

B.  Preliminary Injunction Standard

To obtain a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see Oneida Nation of N.Y. v. Cuomo*, 645 F.3d 154, 164 (2d Cir. 2011). "[I]n making such a showing[,] the movant bears a heavy burden." *New York v. Nuclear Regulatory Comm'n*, 550 F.2d 745, 750 (2d Cir. 1977). "The award of a preliminary injunction is an extraordinary and drastic remedy that will not be granted absent a clear showing that the plaintiff has met its burden of proof." *Christie−Spencer Corp. v. Hausman Realty Co.*, 118 F. Supp. 2d 408, 417 (S.D.N.Y. 2000).

The standard is modified somewhat when, as here, the injunction sought is mandatory, since "mandatory injunctions are more burdensome than prohibitory injunctions, and disturb the status quo prior to final adjudication." *Id.* at 418. Thus, a mandatory injunction will issue "only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." *Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 n.4 (2d Cir. 2010) (citation and internal quotation marks omitted).

As explained in the next section, Plaintiffs have not shown a threat of irreparable injury stemming from the existence of methane below the Property. This factor alone requires denial of the requested injunctive relief.[4]

---

[4] Although the failure to establish irreparable harm is dispositive, the Court observes that the deficiencies that resulted in a failure to demonstrate irreparable harm also call into doubt whether Plaintiffs can show likelihood of success on the merits of their claim of "imminent and substantial endangerment to health or the environment" under RCRA. *See Christie−Spencer*, 118 F. Supp. 2d at 423 ("In a RCRA case, the irreparable injury prong of the inquiry effectively

7

C.  Likelihood of Irreparable Harm

A showing of irreparable harm generally "is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (citation and internal quotation marks omitted); *see Nuclear Regulatory Comm'n*, 550 F.2d at 750 ("a clear showing of the threat of irreparable harm . . . . is a fundamental and traditional requirement of all preliminary injunctive relief"). To be irreparable, the injury must be one that "cannot be remedied by monetary damages." *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999) (citation and internal quotation marks omitted).

In cases "brought pursuant to an environmental health statute, the focus of the irreparable harm inquiry shifts to concern for the public interest." *Christie−Spencer*, 118 F. Supp. 2d at 423; *see Wilson*, 989 F. Supp. at 1171. "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable. *If such injury is sufficiently likely*, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987) (emphasis added). Notwithstanding these principles, "[i]rreparable harm is not presumed from a violation of RCRA." *Wilson*, 989 F. Supp. at 1177 (citing *Amoco*, 480 U.S. at 545). "[T]he grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances, and a federal judge . . . is not mechanically obligated to grant an injunction for every violation of law." *Amoco*, 480 U.S. at 542 (citation and internal quotation marks omitted). Courts should decline granting preliminary

---

merges with the Court's analysis of the likelihood of plaintiff's likelihood of success on the merits.")

injunctive relief if, for instance, the risk of harm is speculative in nature. *Wilson*, 989 F. Supp. at 1172.

For an injunction to issue, the threat of irreparable harm must be "neither remote nor speculative, but actual and imminent[.]" *Faiveley*, 559 F.3d at 118 (citation and internal quotation marks omitted); *see Nuclear Regulatory Comm'n*, 550 F.2d at 750 ("The dramatic and drastic power of injunctive force may be unleashed only against conditions generating a presently existing actual threat . . . ." (quoting *Holiday Inns of Am., Inc. v. B & B Corp.*, 409 F.2d 614, 618 (3d Cir.1969))); *City of N.Y. v. Anglebrook Ltd. P'ship*, 891 F. Supp. 908, 925 (S.D.N.Y.1995) (holding that "there must be some actual, viable, presently−existing threat of serious harm"). The party seeking preliminary relief "must show that the injury complained of is of such imminence that there is a clear and present need for relief to prevent irreparable harm." *Anglebrook*, 891 F. Supp. at 925 (internal quotations omitted). A preliminary injunction must not be issued "based only on a *possibility* of irreparable harm[,]" *Winter*, 555 U.S. at 22 (emphasis added); but on a finding that irreparable injury is "*likely* in the absence of an injunction[,]" *id.* (emphasis in original). *See Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (party seeking injunction must demonstrate that irreparable injury is likely before other requirements for an injunction will be considered).

Plaintiffs contend that they risk irreparable harm absent preliminary injunctive relief because of a potential explosion due to "[t]he unmitigated presence of methane vapor underneath the [] Property." (Pl. Mem. at 10.) The facts presented, however, do not support a finding that the presence of gas in the sub-slab of the Property poses an actual and imminent threat of explosion so as to warrant the extraordinary relief requested. Because the record does not clearly

establish a risk of explosion, there is no danger to the public interest for the purposes of irreparable injury. *See Christie−Spencer*, 118 F. Supp. 2d at 423.

Dispositive to Plaintiffs' motion is their failure to present evidence that the methane under the concrete slab of the Building is likely to ignite, or is likely to migrate to an enclosed space where ignition can occur. To combust, concentrations of methane at or above the LEL must encounter both: (1) a sufficient level of oxygen, and (2) an ignition source. (Mitchell Decl. ¶ 29; Tr. 22−23, 47−48, 54.) Although Plaintiffs have come forward with evidence that concentrations of methane in the Property's subsurface surpass the LEL, Plaintiffs have not identified any ignition source in the sub−slab, nor established that there is oxygen in the sub−slab sufficient to cause an explosion. To the contrary, oxygen levels measured in sub−slab soil gas samples in 2009 and March 2014 were measured below the minimum concentration required for methane combustion. (Mitchell Decl. ¶ 29 & Exs. A, I; Tr. 34−35, 46−48.)

Additionally, Plaintiffs cannot point to any objective evidence or data that the methane below the Property has permeated above the sub−slab, or that a pathway exists for the methane to escape to the surface. (*See* Tr. 16, 54.) Multiple rounds of air sampling in the Building have not disclosed actionable levels of methane above ground. (*Id.* at 12−13, 17, 34, 35−36; Mitchell Decl. ¶¶ 8−9, 21, 26−29 & Ex. K; Simon Decl. ¶¶ 10−17 & Ex. A.) As recently as November 5, 2014, thirty−two samples taken throughout the Building−including enclosed spaces, storage areas, floor drains, and the boiler room−did not detect methane except at minute levels approximately 1/100th of the LEL. (Fort. Decl. ¶¶ 25−27; Mitchell Decl. ¶¶ 27−29.) The only other evidence of methane above ground in the Building was from samples of sump and floor drains taken in January 2010, which also revealed low levels of methane at 1/100th of the LEL. (Mitchell Decl. ¶¶ 8−9; Tr. 36.)

Plaintiffs do not seriously challenge the accuracy of these findings. Instead, they pose the possibility that the methane could migrate into confined spaces "where an ignition source may exist" (Pl. Mem. at 8, 14; Fort Decl. ¶ 29): either above ground to enclosed areas in the Building that have not been tested, such as the elevator shafts or space between drywall partitions (Tr.13; Pl. Mem. at 8−9.); or below ground to hidden enclosed spaces such as subsurface utilities or sewers (Tr. 12, 16; Pl. Mem. at 8−9). Plaintiffs contend that, since the Property is located in a commercial area with road and rail traffic, forces beyond their control could supply an ignition source. (Tr. at 12, 16, 23.)

The record indicates, however, that Plaintiffs' claim of a risk of explosion amounts to little more than a speculative prospect. Plaintiffs have failed to identify any "confined spaces" to which methane is likely to migrate and come into contact with an ignition source. When pressed at oral argument, Plaintiffs' counsel posited that methane could hypothetically migrate to an unspecified sewer, where a cigarette could be thrown from a passing truck, causing combustion. (Tr. 30.) Such unsupported conjectures plainly fall short of Plaintiffs' heavy burden of showing that a "reasonable prospect of future serious harm exists." *See Lewis v. FMC Corp.*, 786 F. Supp. 2d 690, 710 (W.D.N.Y. 2011). As discussed above, irreparable injury must be "*likely* in the absence of an injunction"; it is not enough for a plaintiff to face the mere "possibility" of irreparable harm. *Winter*, 555 U.S. at 22 (emphasis in original). Plaintiffs' speculations as to the potential migrations of gas to as yet unknown enclosed spaces do not do not constitute evidence of an "actual, viable, presently−existing threat[.]" *See Anglebrook*, 891 F. Supp. at 925.

The cases to which Plaintiffs cite are distinguishable in that those cases presented clear evidence of a likelihood of explosion. (*See* Pl. Mem. at 11, n.2 (citing, *e.g.*, *Columbia Gas Transmission, L.L.C. v. Robert Borror Logging, L.L.C.*, No. 2:12−CV−39, 2012 WL 2294870, at

\*2 (N.D.W. Va. June 15, 2012) (substantial risk of explosion absent an injunction requiring installation of a remedial measure that would mitigate *expected* levels of stress on a gas pipeline)). The threat of harm in this case is more closely analogous to that in *Grace Christian Fellowship v. KJG Investments Inc*. In *Grace*, the court denied a preliminary injunction to address gasoline vapors underneath the property at issue because the movant failed to establish "a complete exposure pathway from any gasoline vapors in the sub−slab . . . to the [] building," and therefore failed to demonstrate irreparable harm. No. 07–0348, 2009 WL 2460990, at \*11−12. Similarly, *in Tri−Realty Co. v. Ursinus Coll.*, No. CIV.A. 11−5885, 2013 WL 5298469, at \*12 (E.D. Pa. Sept. 19, 2013), the court "found irreparable harm to be insufficiently likely because there was no evidence of a completed exposure pathway between the source of contamination and the area of concern." Plaintiffs in this case likewise have offered no evidence of a pathway between the methane below ground and areas where it can encounter an ignition source and sufficient oxygen to combust. In sum, Plaintiffs have not established that combustion is reasonably likely as a result of the accumulation of methane underneath the Property. Accordingly, Plaintiffs have failed to establish that absent a preliminary injunction, they will suffer irreparable harm in the interim period prior to a final resolution of its claims.

Furthermore, Plaintiffs' delay in bringing their motion for preliminary injunctive relief is inconsistent with their claim that Plaintiffs would suffer irreparable harm if an injunction were not issued. Delay in seeking relief may "indicate an absence of the kind of irreparable harm required to support a preliminary injunction." *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985). "Lack of diligence, standing alone, may . . . preclude the granting of preliminary injunctive relief, because it goes primarily to the issue of irreparable harm." *Majorica, S.A. v.*

*R.H. Macy & Co., Inc.*, 762 F.2d 7, 8 (2d Cir.1985). Here, Plaintiffs did not seek a preliminary injunction until October 27, 2014—over two years after it filed suit in this case.

Plaintiffs attempt to explain the delay by arguing that the harm has only recently become imminent, based on data obtained in August 2014 from monitoring wells that were installed in the summer of 2014, which revealed concentrations of methane at 100 percent of the LEL underneath the Building. (Tr. 19−20, 26−27.) However, Plaintiffs' claim that they discovered the widespread nature of the contamination on the Property in August 2014 ignores the lengthy history of oil storage and disposal on the Property and adjoining Quanta Site, as well as the over-five-year investigation of the Property under DEC oversight.[5] Plaintiffs participated in sampling of potentially explosive vapor at the Property as early as 2004, suggesting that Plaintiffs have long known about the risk of combustible gas on the Property. (*See* Simon Decl. ¶¶ 12-13; Dkt. 450 at 33.) Plaintiffs further participated in DEC−supervised investigation, from 2002 to 2005, of contamination at the Quanta Site and neighboring areas, including the Property. (*See, e.g.*,

---

[5] Defendants' reliance on cases such as *Rococo Assocs., Inc. v. Award Packaging Corp.*, 803 F. Supp. 2d 184, 192 (E.D.N.Y. 2011) for the proposition that Plaintiffs cannot obtain relief under RCRA because of DEC's ongoing oversight is misplaced. (*See* Exxon Mem. at 22−24.) In those cases, a remedial scheme already was underway or had concluded, such that there was nothing more that the Court could direct any party to do in furtherance of RCRA's goal of remediating the hazardous waste. *See 87th St. Owners Corp. v. Carnegie Hill*, 251 F. Supp. 2d 1215, 1220 (S.D.N.Y. 2002) (citing 42 U.S.C. § 6972(a)(1)(B)). By contrast, Defendants' remedial investigation report was only submitted to the DEC in November 2014, and has not yet resulted in remedial measures. DEC involvement does not by itself divest this Court of jurisdiction to award relief under RCRA. *See, e.g.*, *Lambrinos v. Exxon Mobil Corp.*, No. 1:00−CV−1734, 2004 WL 2202760, at *6 (N.D.N.Y. Sept. 29, 2004); *Kara Holding Corp. v. Getty Petroleum Mktg., Inc.*, 67 F. Supp. 2d 302, 311 (S.D.N.Y. 1999). Nevertheless, for purposes of determining whether Plaintiffs face a threat of irreparable harm due to a risk of explosion, the Court finds significant that the DEC declined to direct any party to undertake any remedial measures on an emergency basis, or required any party to take immediate action to protect against methane. (*See, e.g.*, Tr. 49−50; Mitchell Decl. ¶¶ 12, 15−16.)

Mitchell Decl. ¶ 3; Tr. 20−21, 24−25, 27.)[6] At the latest, the record suggests that Plaintiffs were aware of the contamination and methane underneath the Property as of April 24, 2013, when samples from other monitoring wells detected LEL readings of 100 percent within the sub−slab. (*See, e.g.*, Fort Decl. ¶ 17 & Ex. C; Tr. 24, 25−26, 27.) Yet Plaintiffs did not move for a preliminary injunction upon obtaining the April 2013 data. The Court is unpersuaded that 100 percent LEL readings in August 2014 that are consistent with earlier well sampling render the threat of explosion more imminent than in April 2013.

Plaintiffs' representations to the Court further indicate that Plaintiffs were concerned about risks associated with methane, including an explosive potential, well before August 2014. For instance, in a letter to the Court dated June 27, 2013, Plaintiffs stated that "[r]ecent environmental sampling shows widespread contamination . . ." (Dkt. 73 at 2.) Quoting from the report reflecting April 2013 sampling data, Plaintiffs further stated that "the 100% LEL reading is a significant concern because it indicates that the vapors above the liquid in the well are potentially explosive[.]" Approximately one year after expressing their concerns about the level of combustible vapors on the Property, Plaintiffs now rely on substantially the same contentions to move for the "extraordinary remedy" of a preliminary injunction. *See Winter*, 555 U.S. at 22. The Court thus finds that Plaintiffs' delay is further evidence against the imminence of any irreparable harm, and weighs against granting preliminary relief.

Plaintiffs' claim of irreparable harm due to a threat of explosion at the Building is further undermined by the fact that Plaintiffs continue to allow tenants to lease, occupy, and work in the Building on a daily basis. (*See* Tr. 17; Brayman Decl. ¶ 3.) Plaintiffs' representations that they

---

[6] Indeed, Plaintiffs retained an environmental consultant in April 2011 (Fort Decl. at ¶ 4) and in February 2012, served a Notice of Endangerment under RCRA on Defendants, alleging imminent and substantial endangerment due to wastes that have migrated from the Quanta Site (Dkt. 449 at Ex. B).

14

have taken certain precautionary measures—such as installing vapor monitors in the Building, issuing warnings to tenants "about the potential presence of explosive gas," and enforcing a smoking ban (Brayman Decl. ¶ 4; Tr. 17; Pl. Mem. at 9)—do not lessen the significance of this fact. That Plaintiffs permit over one hundred individuals to occupy the Building belies Plaintiffs' claims about the likelihood of an imminent explosion and the urgency of the requested injunctive relief.

Finally, the Court observes that inasmuch as remedial measures are immediately necessary, Plaintiffs have access to an adequate remedy at law under CERCLA.[7] 42 U.S.C. § 9607(a)(4)(B). CERCLA authorizes parties "to recoup money spent to clean up and prevent future pollution at contaminated sites or to reimburse others for cleanup and prevention at contaminated sites." *Consol. Edison Co. of N.Y., Inc. v. UGI Utils., Inc.*, 423 F.3d 90, 94 (2d Cir. 2005); *see Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 120 (2d Cir. 2010) (CERCLA "provide[s] property owners an avenue of reprieve; it allows them to seek reimbursement of their cleanup costs"). As explained in *Christie−Spencer*, "to the extent plaintiff fears that it will someday be responsible for [] clean−up costs, it has an adequate remedy at law against HRC under both CERCLA and RCRA, as well as the common law." 118 F. Supp. 2d at 425.

Plaintiffs thus have the option to undertake the remedial measures they request and later seek compensation from Defendants for the cost of these measures, should Plaintiffs ultimately prevail in this action. Plaintiffs do not contest that they have adequate financial resources to implement the measures they request in their motion and that they have retained consultants with

---

[7] Although a private party cannot recover the costs of a past cleanup effort under RCRA, the statute does not preclude a party from recovering its cleanup costs under other federal or state laws. *Meghrig*, 516 U.S. at 487−88.

the expertise as well as a plan to institute remediation measures. (Tr. 29, 38−39, 58, 69; Fort Decl. ¶¶ 31−32 & Ex. H.) Plaintiffs' own expert further states that these measures can be implemented concurrently with, and are complementary to, Defendants' ongoing investigation of the Property. (Fort Decl. ¶ 33.)

For all of the aforementioned reasons, the Court holds that Plaintiffs fail to meet their heavy burden of clearly establishing an "actual and imminent" threat of irreparable harm that warrants preliminary relief before a trial on the merits. *Faiveley*, 559 F.3d at 118. Having so concluded, the Court need not address the other requirements for obtaining a preliminary injunction. *See Nuclear Regulatory Comm'n*, 550 F.2d at 750 (affirming denial of preliminary injunction motion on ground that "appellant has failed to demonstrate by the required showing the threat of irreparable injury," making consideration of other requirements unnecessary). Accordingly, Plaintiffs' motion for a preliminary injunction is denied.

*CONCLUSION*

For the reasons stated above, the Court denies Plaintiff's motion for a preliminary injunction.

SO ORDERED:

Dated: February 11, 2015
      Brooklyn, New York

    /s/ Pamela K. Chen
PAMELA K. CHEN
United States District Judge